OESAU, Respondent, vs. ESTATE OF OESAU, Appellant.

*April 11—May 1, 1914.*

*Husband and wife: Antenuptial agreements: Validity: Burden of proof: Construction.*

1. There is nothing inherently suspicious about antenuptial contracts, and in the absence of unfair characterizing circumstances they are to be regarded with favor rather than disfavor.

2. In general, the burden is upon the one impeaching such a contract to show its invalidity; but if there is anything about it, considering all the circumstances, indicating that the intended wife was unduly influenced to make it, that will overcome its *prima facie* validity.

3. In this case an antenuptial contract between a widower sixty-eight years of age and a widow of sixty-two, each of whom had a family of grown-up children and a substantial fortune and was thoroughly capable of managing all personal affairs, by the terms of which each was to retain ownership, control, and the right to dispose of his or her own property the same as if unmarried, is *held*, upon the evidence, to have been fairly and understandingly made and not to be impeached by any circumstance.

4. The fact that such contract expressly provided that in case either party should die intestate the property of such party should go to his or her own descendants the same as if no marriage had taken place, does not permit a construction rendering the agreement ineffective in case of the testacy of the husband and entitling the widow in such case to claim statutory rights in his estate—that being contrary to the plain purpose of the contract.

5. The intention of the parties at the time such contract is made is to be taken as its legal meaning if it can be found expressed in the language used. If such intention is clearly expressed, rules for construction are unnecessary; but where there is uncertainty as to which of two or more reasonable meanings the minds of the parties met upon, that one should be taken which is most favorable to the woman from the point of view of the parties when it was made.

APPEAL from a judgment of the circuit court for Calumet county: GEO. W. BURNELL, Circuit Judge. *Reversed.*

Proceedings involving the validity and scope of an antenuptial contract.

In January, 1901, Tjark P. Oesau, a widower with several adult children, and *Amelia Arps,* the plaintiff, then a widow with several grown-up children, intermarried. They were well-to-do German people. He was about sixty-five years of age and possessed a fortune around $17,000. She was sixty-two years of age and possessed a fortune of about $7,000, derived from her deceased husband's estate. She was a woman of considerable business experience and of more than ordinary intelligence, but did not read or understand English words. She was executrix of her first husband's will and attended to the business in an efficient manner. After the settlement of the estate she attended to her business in a frugal and creditable manner. She had a small house worth $700 to $1,000, with suitable furniture therefor. The two persons lived a few miles apart but had been acquainted many years. They were engaged to be married a few weeks before the union took place. Preparatory therefor they went to the office of a reputable attorney to have an antenuptial contract executed. The paper, after having been prepared, was read by the lawyer to *Mrs. Arps.* He could speak German to some extent and did the best he could to make her understand the paper. Mr. Oesau had told her what it was for. She did not get a full understanding of the language used but fully appreciated that if she and Mr. Oesau executed it and then intermarried, it would secure to her capacity to possess and dispose of her property the same as if she were single and he would be likewise protected as to his property. With that understanding the paper was executed in duplicate. One of the two papers was delivered to her and the other was retained by him. At the same time Mr. Oesau proposed to take over *Mrs. Arps's* homestead and give her $700 therefor and that they should reside there. She accepted such proposal. The deed was made, the $700 paid and, shortly after the marriage, they moved to the place and there resided until Mr. Oesau died.

Sometime after the marriage *Mrs. Oesau* visited a lawyer, who could read and speak German, for the purpose of having her will drawn. At that time she exhibited the contract and was told, as she testified, that it did not amount to anything. Mr. Oesau and plaintiff lived harmoniously together for some eleven years when he died testate. He willed his property in harmony with the antenuptial contract, only making a nominal provision for *Mrs. Oesau* and, in explanation thereof, attached the contract to his will. She possessed her duplicate of the contract from the time it was made. The other duplicate, the day after its date, was duly recorded in the office of the register of deeds of Calumet county. His estate was of the value of about $20,000. In due time she renounced under the will and claimed statutory rights. The executor contested her claim because of the antenuptial agreement. The county court decided that it was void. The circuit court made findings in harmony with the foregoing and decided that the contract did not relinquish prospective statutory rights; moreover, that, under the circumstances, it was presumably void, casting the burden of proof on the executor to show that *Mrs. Oesau* understood the purport thereof when she signed it and that such proof was not produced.

The contract so far as necessary to be examined, is as follows:

"Witnesseth, that whereas, said parties hereto are about to intermarry, it is hereby agreed and understood by and between them that each of said parties hereafter, notwithstanding their intermarriage, shall own and can dispose of any and all real and personal property, money, notes, bonds or securities, of any and all kinds, the same as if no such marriage ever took place between said parties; that is to say, that any and all property, real and personal, moneys, notes, mortgages and securities now owned or that he may hereafter own by said first party, that he can alone without the signature, consent or the will of said second party sell, deed, mortgage and

transfer the same himself just the same as if he still was a widower; and said second party hereby agrees and binds herself to sign at any time any deed or mortgage of any real estate now owned, or which may hereafter be owned by said Tjark P. Oesau, and that all property, real and personal, money, notes, mortgages and securities owned or belonging to said first party at the time of his death, if he dies intestate, shall go to and belong to the present children and their legal descendants of the said Oesau, without any claim, charge, dower or homestead right or interest of said *Amelia Arps* therein as the wife of said Tjark P. Oesau; and it is hereby agreed and understood by and between both of said parties that any and all property, real, personal, money, notes, mortgages or securities now owned or which may hereafter be owned by said *Amelia Arps,* shall belong to and be exclusively owned and controlled by her, and that she can at any time sell, deed, give away and dispose of all thereof at any time and in whatever way she may see fit, the same as if she were a widow and unmarried, and that if she should die intestate, then that all of her property, money, notes, securities, real and personal, shall descend and go to and belong to her present children or their descendants, and not to Oesau or his heirs; and said first party promises and agrees to at any time when asked by said second party to sign any deed, mortgage, bill of sale or other paper necessary to carry out the purposes and intentions of this contract and agreement, and said Oesau hereby waives and gives up any right or claim which he may have as and by tenancy in curtesy if he should survive said second party, in any property which she may own at her death, and to a full and liberal compliance with the terms and conditions of this agreement and contract, we, and each of said parties for themselves, and for and in behalf of their respective heirs, executors and administrators and assigns bind themselves to faithfully comply therewith in letter and spirit; and that the consideration therefor is the sum of one dollar paid by each of said parties to the other, and other good and valuable considerations."

Judgment was ordered in accordance with the foregoing.

For the appellant there was a brief by *James Kirwan* and *Nash & Nash,* and oral argument by *E. G. Nash.*

*J. E. McMullen,* for the respondent.

MARSHALL, J.   Did the trial court err in holding the ante-nuptial contract void?

The stated question turns on some well settled principles which may well be referred to, *Deller v. Deller,* 141 Wis. 255, 124 N. W. 278, for sufficient illustration and support.

There is nothing inherently suspicious about antenuptial contracts.   They are, in the absence of unfair characterizing circumstances, to be regarded with favor rather than disfavor. In general, the burden is upon the one impeaching such a contract to support the claim of invalidity rather than upon the adversary to support the contrary.   If there is anything about such an instrument, considering all the circumstances, indicating that the intended wife had been unduly influenced to make it, that will overcome its *prima facie* validity, so as to require the person asserting the contrary to, at least, restore such character.

The record does not seem to disclose any circumstance warranting a supposition that the contract in question was not fairly and understandingly made.   The ages of the parties, the circumstances that each had been married before and had a good family of grown-up children; that each had a substantial fortune and was thoroughly capable of taking care of all personal affairs and that desire for companionship was the thing desired and, substantially, the only inducement for the proposed marriage, led the two, very naturally, intelligently, and discreetly, to arrange their property matters by the preliminary treaty.   The facts all show that the parties were mutually desirous of not entering into a marriage contract under such circumstances as to interfere, in any way, with individual control over property or the prospective rights of their respective children.

In making the contract Mr. Oesau seems to have acted with commendable care.   He, in company with his intended wife, visited a reputable lawyer of his county for the purpose of having the paper prepared.   The lawyer was the one he had previously employed to perform the service.   He explained

to respondent the object and nature of the paper so she fully understood its purport, though not the meaning of the words used. The lawyer, who could speak the German language to some extent, supplemented Mr. Oesau's efforts. It may be, as stated, that she did not understand all the language used in the paper; but she understood the object of it and the effect of her signing it. She testified, very definitely, that the paper was read to her; that Mr. Oesau translated it to her, and that the lawyer, so far as he could, did so, and that her understanding was that it so provided that each would own and control his or her own property the same as if unmarried. When respondent was interrogated about the meaning of terms used she said that she was not made to understand them; but that counts for little in face of her positive testimony substantially as follows: I understood that the contract would insure to me continued control, as before, of my property and would likewise insure Mr. Oesau. I understood that the effect of the paper was that I could sell my property or will it as I pleased and Mr. Oesau could do the same with his property.

It is evident that, with full understanding as indicated, respondent freely executed the contract in duplicate. The fact that it was so executed; that one of the originals was delivered to respondent and that she had full opportunity to have it explained to her by others for a considerable period of time before the marriage, indicates that there was no disposition on the part of Mr. Oesau to deal unfairly with her. True, there is some evidence given by respondent to the effect that Mr. Oesau suggested keeping the matter secret, but that is of no weight in view of the circumstance that he promptly placed his duplicate of the contract on record where it was open to the public for some days before the marriage and for all the years afterward which elapsed before his death.

We do not fail to note the evidence of respondent's having visited a lawyer of her own race to draw her will and who was

fully competent to read and explain the agreement to her in the German language; that she showed the paper to him and that after reading it he said it did not amount to anything. That casts no discredit on the agreement. It is quite certain that the lawyer did not advise respondent that the agreement did not amount to anything in the sense that it was unfair or illegal. Respondent, doubtless, exhibited the paper in connection with having her will drawn and was, very properly, told that it did not abridge her liberty to dispose of her property by will.

Looking at the matter before us as indicated, it seems very plain that the trial court erred in deciding that respondent did not understand the purport of the contract when she signed it or that there were any circumstances impeaching its validity.

Was the agreement displaced by the circumstance of Mr. Oesau dying testate? That is not mentioned in the findings but is in an opinion filed and also in the judgment.

It seems to have been thought that the language of the agreement to the effect that, in case of either party dying intestate the property of such party shall go to his or her own children the same as if no marriage had taken place between such parties, will admit of a construction rendering the agreement ineffective, except in case of intestacy; that otherwise the survivor would possess the same rights as if the agreement had not been made, and that, as between such meaning and any other less favorable to the respondent, it should be taken as expressing the intention of the parties.

The rule of construction which the learned circuit court had in mind hardly goes to the extent to which it seems to have been applied. The rule which overshadows all others, in determining the legal meaning of an agreement, applies to antenuptial as well as to other agreements,—there is no difference. The meaning which the parties attributed to the paper they executed at the time it was signed,—their then in-

tention,—is to be taken as the legal meaning, if it can be found expressed in the language used. In case of a contract being unambiguous no attempt should be made to determine its meaning by rules for construction. In case of its meaning being obscure, then of two or more reasonable meanings and uncertainty as to which the minds of the parties met upon, that one should be taken which is most favorable to the woman from the viewpoint of the parties when the agreement was made.

A contract is not, necessarily, obscure because some particular word or clause, by itself, is susceptible of being read in two or more ways. Notwithstanding that, if looking at the writing in all its parts, the meaning is clear, there is no case for a choice between conflicting reasonable meanings.

In applying the rule of construction referred to, it must be appreciated that only reasonable means, under all the circumstances, looking at the entire paper and the general purpose of it, should be considered in making a choice. That is important. So the question is whether from the viewpoint of the parties at the time they contracted, it can reasonably be supposed that Mr. Oesau and respondent intended to settle their property matters so that the proposed marriage would not prejudice their respective interests and yet to leave the scheme so infirm as to fail, utterly, of any *post-mortem* effect, in case of testacy, to protect the children of the deceased in the full enjoyment of their parent's possessions according to his purpose. Can it be believed that if the parties had any such idea, each would have made a will and thereby wholly nullified the antenuptial contract as to *post-mortem* effect?

The main purpose of the contract, evidently, was to so provide that the family of neither of the parties should profit by the property of the other, and yet, if the trial court be right, they deliberately so agreed that, in case of Mr. Oesau dying testate, the contract would not cut any figure at all in the distribution of his property. We are constrained to hold that

such an idea is so contrary to the obvious purpose of the parties as not to fall within the class of reasonable meanings from which to choose under the rule in question. On the other hand, it seems so plain that the purpose of the contract was, as we have indicated, that the meaning of the particular language which the trial court dealt with so as to favor respondent can hardly be said to be involved in obscurity. One would hardly think, reasonably, if, in contemplation of marriage, he entered into a contract to preserve his property to himself and his children and yet so provided that in case of his making a will the agreement would be of no effect whatever. It is not considered at all likely that either of the parties to the contract in question contemplated any such outcome of their efforts to preserve, unimpaired by marriage, their liberty as to property matters. The idea embodied in the agreement is that in case of the death of either party the property of such party shall go to his or her family, except as otherwise provided by will.

It must not be thought that the circumstance has been overlooked that respondent at the time of the making of the antenuptial agreement deeded her home to Mr. Oesau for the sum of $700. That was probably all Mr. Oesau thought it was worth. The fact that many years afterwards evidence could be produced that it was worth perhaps two or three hundred dollars more is of no significance. Doubtless, respondent, under the circumstances was better off with the $700 than with the little home. On the whole, it does not seem that the circumstance as to the house has any bearing on the case.

*By the Court.*—The judgment appealed from is reversed, and the cause remanded with directions to render judgment in accordance with the opinion and to so remand the cause to the county court for guidance in the further execution of the will of Tjark P. Oesau, deceased.