FIRST WISCONSIN NATIONAL BANK OF MILWAUKEE, Respondent, vs. JAHN, imp., Appellant.

*November 11—December 5, 1922.*

*Husband and wife: Inability of married women to contract: Disability or privilege: At common law: Effect of "equal rights" statute.*

1. Under sec. 6.015, Stats. 1921, an enforceable liability is created against a married woman who becomes an accommodation indorser upon a negotiable promissory note under such circumstances as to make her in effect a surety for the maker, even though the transaction be without consideration and in no way relating to her separate estate or her separate business.

2. Said sec. 6.015 includes married as well as unmarried women, where applicable, and is not fatally indefinite or uncertain because it does not enumerate all the provisions of the statute which may be affected by it.

3. It is doubtful whether the clause in sec. 6.015 which requires courts and officers to construe the statutes where the masculine gender is used to include the feminine gender "unless such construction will deny to females the special protection and privileges which they now enjoy for the general welfare," applies to the first clause, but if it does, the disability of a married woman at common law to contract was not a protection or privilege. Sec. 6.015 removes entirely the disabilities imposed upon married women, and they may make themselves liable as sureties as freely as men.

4. The disabilities which occasioned the interposition and protection of equity no longer existing, the liabilities of married women, contractual or otherwise, may be enforced in the same manner as similar liabilities against men.

APPEAL from an order of the circuit court for Milwaukee county: OSCAR M. FRITZ, Circuit Judge. *Affirmed.*

Demurrer. The plaintiff bank began this action to enforce collection of a series of seven notes, the liability of the parties being set up in seven different causes of action. We have no concern with any but the seventh.

From the allegations of the complaint it appears that on the 19th day of December, 1921, the Milwaukee Patent Leather Company executed its promissory note in the sum of $8,000 to the plaintiff; that before delivery thereof William P. Jahn and *Amalie Jahn* indorsed the same; that thereafter the note was delivered to the plaintiff, was not paid when due, and this action is begun to recover the amount of the note with interest and costs from the maker and the accommodation indorsers.

The defendant *Amalie Jahn* made a separate answer, and by way of a separate defense set up the fact that at the time of the making and delivery of the note upon which the seventh cause of action is based she was and still is a married woman, the wife of the defendant William P. Jahn, and alleges that she indorsed the note as an accommodation indorser without consideration, and that the transaction was in no way related to her separate estate or her separate business. Other facts are alleged which are not material here.

First Wis. Nat. Bank v. Jahn, 179 Wis. 117.

The plaintiff demurred to the matters set out as a separate defense by the defendant *Amalie Jahn* for the reason that the same did not state facts sufficient to constitute a defense to the action. The demurrer was sustained, and from the order sustaining the demurrer the defendant *Amalie Jahn* appeals.

For the appellant there was a brief by *Austin, Fehr, Mueller & Gehrz* of Milwaukee, and oral argument by *Arthur A. Mueller..*

For the respondent there was a brief by *Bloodgood, Kemper & Bloodgood,* attorneys, and *Emmet Horan, Jr.,* of counsel, all of Milwaukee, and oral argument by *Mr. Horan.*

ROSENBERRY, J. It is not claimed that the facts stated as separate defenses in the answer of the defendant *Amalie Jahn,* to which a demurrer is interposed, constitute a defense upon any other ground than that *Amalie Jahn* is a married woman. The facts alleged show that she was clearly an accommodation indorser and by the indorsement of the note in suit became in legal effect surety for the debt of a third person, the transaction in no way concerning or relating to her separate estate. Under such circumstances it is claimed she cannot be charged in an action at law, she being a married woman. *Bailey v. Fink,* 129 Wis. 373, 109 N. W. 86; *Merrell v. Purdy,* 129 Wis. 331, 109 N. W. 82; *Farmers & M. Bank v. Frederiksen,* 173 Wis. 645, 182 N. W. 327.

Such is undoubtedly the law of this state by a long line of decisions, unless the rule has been changed by ch. 529, Laws 1921, known as sec. 6.015, Stats. 1921. The section is as follows:

"Sec. 6.015 (1) Women shall have the same rights and privileges under the law as men in the exercise of suffrage, freedom of contract, choice of residence for voting purposes, jury service, holding office, holding and conveying property, care and custody of children, and in all other

respects. The various courts, executive and administrative officers shall construe the statutes where the masculine gender is used to include the feminine gender unless such construction will deny to females the special protection and privileges which they now enjoy for the general welfare. The courts, executive and administrative officers shall make all necessary rules and provisions to carry out the intent and purposes of this statute.

"(2) Any woman drawn to serve as a juror upon her request to the presiding judge or magistrate, before the commencement of the trial or hearing, shall be excused from the panel or venire."

The act was approved July 11, 1921, and published and in effect on and after July 15, 1921. The note upon which suit is brought is dated December 19, 1921, and was indorsed and delivered to the plaintiff on that day. This is the first case which has arisen requiring a construction of sec. 6.015, or, so far as we are advised, of a similar statute.

The fact that the original indebtedness was incurred and the first note given prior to the enactment of sec. 6.015 is immaterial, and it is not claimed otherwise here. If she were not liable before, she might become liable as an accommodation indorser, if she was capable of contracting by indorsing the note on December 19, 1921. So we may consider the transaction involved here as that of a married woman becoming an accommodation indorser upon a negotiable promissory note under such circumstances as to make her in effect a surety for the maker, the transaction being without consideration and in no way related to her separate estate or her separate business. Is a liability created against her under such circumstances and can it be enforced in a legal action?

It is conceded that the limitation upon the right of a wife to become a surety was one which was evolved from the common law and not one created by any statute of this state. It is argued on behalf of the appellant that the common-law rule was intended to protect the wife against the

First Wis. Nat. Bank v. Jahn, 179 Wis. 117.

importunities of the husband and created a right or privilege
in the wife and not in the husband; that the act of 1921
did not impose any additional liabilities upon the wife, but
was intended to grant additional rights and privileges in the
following respects:

(a) The act was intended primarily to secure to women
equal political and civil rights.

(b) The act, by its express provisions, reserved to fe-
males the special protection and privileges which they now
enjoy for the general welfare.

(c) The act, like all similar acts, should be construed to
secure to the wife the rights and privileges previously en-
joyed.

Some argument is made to the effect that the statute is
not in terms made applicable to married women. Un-
married women prior to the enactment of the statute, in
many of the particulars enumerated in the chapter at least,
enjoyed equal rights with men, particularly so after the
adoption of the Nineteenth Amendment, but under the
statutes as they stood prior to the enactment of sec. 6.015,
even unmarried women did not enjoy in some respects the
same rights and privileges as men, particularly in the matter
of jury service. The word "women" must be held to
include all women. Therefore it includes any woman
whether married or unmarried. In those respects where it
is applicable only to married women it should be so applied.
In those respects where it is applicable to unmarried and
married women it should be so applied. If in some respects
it applies only to unmarried women, which does not seem
to be the case, it should be so applied. The statute is not
fatally indefinite or uncertain in terms because it does not
enumerate or catalogue all of the provisions of the statutes
which may be affected by it. Had an attempt been made
to do that, it would have been more definite and certain as
to the matters enumerated. But, on the other hand, it is
very probable at least that the law would have been thrown

into confusion because of the impossibility of accurately referring to all of the matters intended to be affected by it.

The first question to be settled in a determination of the problem presented for solution is, What is the nature of the disability of married women to contract at common law? Is it in the nature of a limitation upon her freedom to contract or is it a privilege bestowed upon her for her protection? The history of the development of the common law relating to the rights and disabilities of married women presents a fascinating field for study. We shall not yield to the temptation to develop the history of the common law upon that subject. It was the theory of the common law that by marriage the husband and wife became one person. It was considered that the *persona* of the wife was completely merged in that of the husband and thereby nearly all of her property became his and his domicile became her domicile. Lawrence, Law Affecting Married Women, p. 1.

For the historical development of Anglo-Saxon and Anglo-Norman law relating to property of married women, see 4 Annals of American Academy of Political and Social Science, 233 (Buckstaff); Women under the English Law (1896) (Cleveland).

Blackstone says (Book II, p. 433):

"A sixth method of acquiring property in goods and chattels is by marriage; whereby those chattels, which belonged formerly to the wife, are by act of law vested in the husband with the same degree of property and with the same powers, as the wife, when sole, had over them. This depends entirely on the notion of an unity of person between the husband and wife; it being held that they are one person in law, so that the very being and existence of the woman is suspended during the coverture or entirely merged or incorporated in that of the husband."

By the common law the husband had full dominion over the person and property of his wife. It was therefore an

entirely logical deduction that the wife should have no power to contract, for, if she had, her husband would be liable upon her contracts. Upon marriage he became liable for her ante-nuptial debts and after marriage was liable for her torts. 3 Page, Contracts (2d ed.) ch. 52; *Conway v. Smith,* 13 Wis. 125; *Krouskop v. Shontz,* 51 Wis. 204, 8 N. W. 241; 1 Bishop, Married Women, § 35.

In closing his observations upon the legal consequences of marriage Blackstone says:

"These are the chief legal effects of marriage during coverture; upon which we may observe that even the disabilities which the wife lies under are for the most part intended for her protection and benefit; so great a favorite is the female sex of the laws of England." Blackstone's Comm. Book I, p. 445.

In a note in 1 Cooley's Blackstone, page 290, is found a statement of the disabilities under which the wife labored at common law.

It is to be noted, however, that in this very phrase, as in the discussion of related subjects, Blackstone referred to the limitations imposed upon the wife by marriage as "disabilities," and while in the closing sentence he says they are intended for her protection and benefit, nevertheless the theory of the law as stated by Blackstone as well as other common-law writers clearly shows that as to the wife they were considered as disabilities and as to the husband as an assertion of a right which he enjoyed for his personal benefit and the protection of his estate.

Reference is made to the case of *Fuller & Fuller Co. v. McHenry,* 83 Wis. 573, 53 N. W. 896, in an attempt to argue that in the enactment and administration of laws by which married women have gradually acquired rights over their property equal to that of a *feme sole,* there has been a declared purpose to protect the wife against the importunities of the husband. This argument overlooks

the fact that the statutes referred to and which are spoken of as protecting the wife in the enjoyment of her property are those which remove common-law disabilities, and the language used did not refer to the enactments and developments of the law which created the disability. In the case of *Fuller & Fuller Co. v. McHenry, supra,* referring to the purpose and policy of the statute concerning the rights of married women, it is said:

"Manifestly, it was not intended that the act should receive a construction that would be subversive of the beneficent purposes for which it was enacted, and which would almost necessarily tend to strike down the protection it was intended married women should have under it in the use and enjoyment of their separate estates."

The purpose of these statutes in general was to remove the limitations imposed by the common law upon married women and at the same time leave them with such protection as it afforded. The disability under which married women labored at common law was not a "special·protection and privilege which they enjoyed for the general welfare." It has not been so regarded by courts generally, and perhaps no better statement of the matter can be found than in *Conway v. Smith,* 13 Wis. 125, 129. The court said:

"At the common law the legal existence of the wife was, for most purposes, merged in that of the husband. She was not allowed to hold property to her separate use; and in harmony with the same idea, she was denied the capacity to contract. The common law was consistent with itself. Having destroyed the power to hold and control her property, the power to contract, which is incident to the other, was destroyed along with it. But this rule, though consistent, was narrow and restricted, and did not meet the wishes or the interests of society. The court of equity, therefore, early found means to evade it, through the intervention of trusts for the separate use of married women. It is immaterial to my present purpose to notice the equitable doctrine upon that subject, further than to say that the substance which it secured was the power of holding

First Wis. Nat. Bank v. Jahn, 179 Wis. 117.

property to their separate use by married women. And having established this encroachment upon or evasion of the common law, it was then held that the power of disposition, and of making some contracts concerning the property, was necessarily incident to the power of holding and enjoying it."

There are many decisions like *Conway. v. Smith,* construing statutes relating to the property rights of married women and their power to contract, in which we find expressions commending such legislation; but nowhere do we find the disabilities of married women at common law spoken of as rights or privileges so far as they affect the wife. The limitation upon her right of contract is invariably referred to in that connection as a disability. At common law a married woman might make some valid contracts such as contracts of agency and those relating to trusts, but the field in which she could contract was very limited. 1 Bishop, Married Women, p. 517.

When sec. 6.015 says that "women shall have the same rights and privileges under the law as men in . . . freedom of contract," it means what it says, and that is that women shall be as free as men to make personal contracts. It means that the disabilities imposed upon married women at common law by marriage are entirely removed and the field in which she may contract is correspondingly enlarged.

It is doubtful at least whether or not that clause of sec. 6.015 which provides, "The various courts, executive and administrative officers shall construe the statutes where the *masculine gender* is used to include the feminine gender," applies to the construction of the first clause of the section. It is not the masculine gender which is there used, it is the feminine. Rights are thereby conferred not upon men but upon women. True it is that the rights conferred are to equal those which men enjoy, but rights are granted to women, not to men.

Even if it were held applicable, the disability of a married woman at common law to make a contract was not, as we have seen, a special protection or privilege which she enjoyed for the benefit of the general welfare.    Under the common law the rights of the wife were subordinate to those of the husband, not for her protection but for his benefit, a conception which had its origin in the feudal law. Appellant refers to language contained in *Miller v. Wilson,* 236 U. S. 373, 35 Sup. Ct. 342, as supporting her contention.    In that case the supreme court of the United States sustained the constitutionality of a statute limiting the right of a female to contract for her personal service to certain hours fixed by statute.    The language is as follows:

"Even though all restrictions on political, personal and contractual rights were taken away, and she stood, so far as statutes are concerned, upon an absolutely equal plane with him, it would still be true that she is so constituted that she will rest upon and look to him for protection; that her physical structure and a proper discharge of her maternal functions—having in view not merely her own health but the well-being of the race—justify legislation to protect her from the greed as well as the passion of man. The limitations which this statute places upon her contractual powers, upon her right to agree with her employer as to the time she shall labor, are not imposed solely for her benefit, but also largely for the benefit of all."

We fully concur in the sentiment expressed by the supreme court of the United States.    The decision supports the position of the plaintiff rather than that of the appellant. In the construction of sec. 6.015 a clear distinction must be drawn and maintained between those disabilities which a woman incurred upon her marriage at the common law and those rights and privileges which she enjoys under modern legislation, adopted in the exercise of the police power of the state for the purpose of preserving the health and morals of women in the interest of the general welfare. It is to this latter class that the statute under consideration in *Miller v. Wilson* belongs.

First Wis. Nat. Bank v. Jahn, 179 Wis. 117.

It is argued that it is in the interest of the general welfare that a married woman should not have the capacity to become a surety for the debt of another. There is a sense, of course, in which all legislation, at least all wise legislation, is in the interest of the general welfare. The term is here used in a narrower and more limited sense. The term "general welfare" is used in this section as referring to those statutes which are enacted in the exercise of the police power and are intended to promote the health, morals, and general well-being of the community at large. There are many statutes relating mainly to hours of work, conditions of employment, sanitation, and other related subjects which are enacted in the exercise of the police power for the purpose of promoting the general welfare, and under and by virtue of which it may be said as in *Miller v. Wilson, supra,* that women enjoy certain protection and are granted certain privileges. It is the rights and privileges granted under this class of statutes to which reference is made in the second clause of the section. No amount of legislation, either statutory or constitutional, can destroy the fundamental differences of sex. All wise legislation at least must recognize established indisputable biological facts. While there is a continual reference in the earlier decisions to women as the weaker, and in some instances the inferior, sex, drawn from a time when social and legal distinctions were based largely upon physical prowess, no one is now heard to contend that because there are fundamental differences between the sexes either sex is for that reason inferior or superior to the other. By recent legislation in this country the sexes have been brought to an absolute equality of right and privilege before the law, but that fact does not and should not strike down sex as a basis of classification in the enactment of laws relating to the health, morals, and general well-being of our people.

This statute, as are other statutes relieving married women from disabilities incurred by marriage at common law, is remedial in its nature and should be fairly and

liberally construed to effect the purpose intended. If experience proves that it is unwise for married women, in view of their actual situation, to be subject to the importunities of their husbands and others in the matter of the disposition of their property and the use of their separate estates, no provision of the constitution will stand in the way of the enactment of laws limiting her right of contract. This law, broad and general though it is, does not exhaust legislative power in this field. No doubt it is but the beginning of a legislative program to effectuate in a broad and liberal way the more modern conception of the place of women in the social, economic, and political life of the country.

We express and are called upon to express no opinion as to the wisdom of this legislation. As this court has said many times over, that is a matter with which the courts have nothing to do and one resting wholly in the discretion of the legislature. In this case the appellant may be deprived of a substantial part of her separate estate in order that the debt of another may be paid. She may receive no benefit or the benefits may be great. The record discloses nothing but the bare fact that she became a surety. This she had a right to do and she must endure the consequences. It is natural that an effort should be made to resist the application of the statute in a case where it may work a hardship. With the consequences to her of the act of the appellant we are not concerned, that being a matter which she determined for herself when she indorsed the note. The law should not be construed away in order to sustain preconceived notions as to the wisdom of conferring upon married women civil and political rights equal to those enjoyed by men.

It is not even contended here that the legislation under consideration in any way violates any provision of the constitution. It is clearly within the legislative field, and it is the duty of the courts to so construe and apply it as

to confer upon women, including married women, all the rights and privileges under the law now enjoyed by men. No doubt some difficulty will be encountered in the application of this statute to the law generally. These difficulties, however, will not be insurmountable. In practice they may prove to be not even formidable. The intent of the legislature is clear and it is manifestly the duty of the courts to effectuate that intention.

We therefore conclude that the common-law disability of a married woman to become a surety for a third person is not a protection or privilege enjoyed for the general welfare, but is a limitation upon her freedom of contract, not resting equally upon men, and that that limitation has by the enactment of sec. 6.015, Stats., been removed, and that she may therefore make herself liable as a surety the same as a man could do under the same or similar circumstances. The disabilities which occasioned the interposition and protection of courts of equity no longer exist, and the liabilities of a married woman, contractual or otherwise, may be enforced as similar liabilities may be enforced against men. She is therefore liable in an action at law.

*By the Court.*—The order appealed from is affirmed.