Estate of Beat: Madison Bank & Trust Company, Administrator w.w.a., and others, Appellants, v. Beat, Respondent.

*September 30—October 27, 1964.*

318

For the appellants there were briefs by *Roberts, Boardman, Suhr & Curry* and *Arthur L. May,* all of Madison, for the Madison Bank & Trust Company, administrator w.w.a., concurred in by *Richard Hollern* of Madison, for Ruth Greve, Doris Kittleson, and Hazel Syverud, and oral argument by *W. Wade Boardman.*

For the respondent there was a brief by *Hall & Griffith* of Madison, and oral argument by *Laurence W. Hall.*

WILKIE, J.   Two issues are presented by the contest over the postnuptial agreement:

*First:* Is the postnuptial agreement valid?

*Second:* May the widow elect under sec. 233.12, Stats., to take her share as provided by law rather than by the postnuptial agreement?

## *Validity of Postnuptial Agreement.*

Postnuptial agreements are permitted in Wisconsin.[1] Nevertheless, the trial court found this agreement to be "void and of no legal effect" specifically finding:

"8. That the said petitioner, Helen Docken Beat, was persuaded by the decedent to sign the marital agreement dated March 9, 1959, without knowledge or effect of its terms.

"9. That the decedent Roy Beat attempted to prevent his wife Helen Docken Beat, petitioner herein, from sharing in his estate in an unfair and imposing manner, without proper disclosure to her of her rights.

"10. That the said decedent in his relationship to the said petitioner as her husband overreached his said wife and persuaded her to sign the said marital agreement by duress and coercion.

"11. That the said decedent, Roy Beat, was guilty of such imposition and overreaching in obtaining the signature of petitioner Helen Docken Beat to the said marital agreement as to constitute actionable fraud sufficient to void the said marital agreement."

---

[1] *Estate of Nickolay* (1946), 249 Wis. 571, 25 N. W. (2d) 451; *Estate of Cortte* (1939), 230 Wis. 103, 283 N. W. 336. Earlier decisions held such agreements to be void: *LeSaulnier v. Krueger* (1893), 85 Wis. 214, 54 N. W. 774; *Leach v. Leach* (1886), 65 Wis. 284, 26 N. W. 754; *Wilber v. Wilber* (1881), 52 Wis. 298, 9 N. W. 163.

These findings will not be upset unless they are against the great weight and clear preponderance of the evidence.[2]

What then are the facts surrounding the signing of the agreement? The evidence is substantially undisputed. In 1957 Roy Beat, about seventy-one years old at the time and who had been a widower for many years, met Helen Docken, about fifty-two years of age, who had been widowed since 1955. She had inherited a farm worth $30,000, and $10,000 in insurance when her husband died. She managed the farm and made many improvements to it. Both had grown children and, in addition, Mrs. Docken had a minor daughter, Nyla, living with her.

Mrs. Docken had been working as a waitress at the Post Cafe in Mt. Horeb since 1955 and it was while so employed she first became acquainted with Mr. Beat. The two dined together on a number of occasions. There was talk of marriage late in 1958, and they were married in Dubuque, Iowa, on March 4, 1959. They returned to Wisconsin immediately. The new Mrs. Beat stayed at her farm and Beat returned to his apartment to live.

Shortly after this, Nyla came down with pneumonia and was hospitalized. The newlyweds did not see each other again until around 6 p. m. on March 9th, when Beat met his wife at the hospital where she was visiting Nyla. He insisted that she had to come with him to sign "that paper." He then took her to the Madison Club for that purpose. There, by prearrangement, they met Beat's attorney (Mr. Arthur May). Mrs. Beat had not met him before. The three had a drink or two before eating.

After dinner, the attorney produced the agreement which he had dictated that day at Beat's request and in his presence. According to Mrs. Beat, this was the first time the subject of the release had even been broached. After reading the docu-

[2] *Estate of Perssion* (1963), 20 Wis. (2d) 537, 123 N. W. (2d) 465; *Estate of Starer* (1963), 20 Wis. (2d) 268, 121 N. W. (2d) 872; *Clark v. Moru* (1963), 19 Wis. (2d) 503, 120 N. W. (2d) 888.

ment, she was asked if that was the agreement she wanted drawn up and if there was anything she did not understand. The attorney stated that if she did not have any questions she should sign it. She was told that the agreement would sever all her rights in Beat's property, but the rights she would have in absence of the agreement were not elaborated. The club manager witnessed the signing. There was a dispute as to whether the signing took place in one room or another. She was given a copy of the document which she still had at the time of Beat's death.

Mrs. Beat returned to the hospital and they did not meet again until March 17th, when they went to Florida for a month. Mrs. Beat and her daughter then moved into Beat's apartment. Nyla lived there until she graduated from high school. At no time did Mrs. Beat question or object to the signing of the agreement or to its provisions.

We must measure this evidence and other evidence in the record against the standards to be used in ruling on the validity of a postnuptial agreement. Each case must be decided on its own facts.[3]

Although there is nothing inherently suspicious or bad about a postnuptial agreement, these agreements will be regarded with rigid scrutiny.[4] Yet the widow, in asserting fraud, has the burden of proving it.[5] In meeting this burden she may be aided by a presumption of fraud that arises in those instances where she is not adequately provided for by the terms of the agreement and where there has not been a full and fair disclosure to her of the husband's worth.[6]

---

[3] *Estate of Koeffler* (1934), 215 Wis. 115, 254 N. W. 363.

[4] *Bibelhausen v. Bibelhausen* (1915), 159 Wis. 365, 150 N. W. 516. This is an antenuptial case, but the rules of law are applicable to postnuptial situations. *Oesau v. Estate of Oesau* (1914), 157 Wis. 255, 147 N. W. 62. See *Estate of Nickolay, supra,* footnote 1.

[5] *Estate of Nickolay, supra,* footnote 1; *Oesau v. Estate of Oesau, supra,* footnote 4.

[6] *Estate of Knippel* (1959), 7 Wis. (2d) 335, 96 N. W. (2d) 514; *Estate of Nickolay, supra,* footnote 1; *Estate of Koeffler, supra,* footnote 3.

Since Mrs. Beat received nothing from her husband's estate under the agreement, a presumption of fraud arises unless there was a full and fair disclosure to her of Mr. Beat's worth. At the time she signed the agreement there was no recitation to her of the nature and value of his property. Mrs. Beat admitted that she was previously aware of his ownership of an interest in a thriving hardware store in Mt. Horeb and in an apartment in that village. She denied any previous knowledge as to his farm, or farm personalty, but these holdings were obvious to anyone who, like Mrs. Beat, had lived for years in the Mt. Horeb area, and whose farm, in fact, was located in the same township of that of Mr. Beat. His substantial interests in the local bank and in the Wisco Hardware Company were well known in the community but there is no evidence that she knew about them. She knew of his manner of living and of his winter trips to Florida.

Under all the circumstances there was a failure on Mr. Beat's part to disclose the extent of his property and a presumption of fraud arises. Therefore, we must look to all the evidence to determine not only whether this presumption is rebutted but also whether the trial court's findings that Mrs. Beat was persuaded by decedent to sign "without knowledge or effect of its terms" (Finding 8), that "the decedent . . . attempted to prevent [her] . . . from sharing in his estate in an unfair and imposing manner, without proper disclosure to her of her rights" (Finding 9), that the decedent "overreached his said wife and persuaded her to sign . . . by duress and coercion" (Finding 10), and that the overreaching was such "as to constitute actionable fraud" (Finding 11), are all against the great weight and clear preponderance of the evidence.

Mrs. Beat was not an ignorant person. The skilful managing of her farm attests to her business acumen.[7] Having

---

[7] A factor relied on in *Nickolay, supra,* footnote 1, and *Oesau, supra,* footnote 4, in sustaining postnuptial and antenuptial agreements respectively.

recently inherited property from her husband, she must have been vaguely familiar with widows' rights in their husbands' estates. She had considerable property of her own.[8] The prospect of leaving the hospital to execute the agreement upset her. But she protested not because of qualms over "that paper" but because her daughter was ill.

Much is made by the respondent of the fact that Mrs. Beat was first confronted with the agreement at dinner. But she read it in its entirety and indicated her satisfaction. The agreement was not legalistic; rather, it was very short and to the point. The effect of signing it was explained to her. In *Estate of Knippel,*[9] the court said, at page 347:

"While misrepresentation of the effect of the agreement as giving her more than she would have been entitled to in its absence, considered in the light of the relationship between the parties and the asserted fact that the parties had never previously discussed an agreement, that she saw it for only twenty minutes before it was signed, and that she was not given a copy until years later, would have constituted fraud if she relied upon such misrepresentation, the county court was not compelled to make a finding of fraud."

Mrs. Knippel did receive a copy of the disputed agreement two years after it was executed and nearly seven years before her husband died. She never alleged any misrepresentation. The court concluded, at page 347:

". . . she had failed to take any action to set aside the agreement during Mr. Knippel's lifetime although she testified that she had seen a copy and expressed her dissatisfaction with it a number of years before he died."

In the present case, Mrs. Beat received a copy of the agreement when it was executed and retained it until Beat's death three years later without any objection whatsoever.

[8] Ibid.

[9] *Supra,* footnote 6.

In *Estate of Nickolay*,[10] the husband took his wife to an attorney on the day after their wedding to execute a post-nuptial agreement. The attorney drafted the document while they were there. Mrs. Nickolay was unaware of any of the terms or possible consequences except that she was to receive $500. No fraud was found. It is true that some consideration flowed to the wife. But without the agreement she would have been entitled to $20,000. The fact that this was not explained to her did not vitiate the contract. In the case at bar, Mrs. Beat read the agreement and the consequences of her signing away any right she might have in his property were explained. Thus there is much less of a taint of fraud than in *Nickolay*. In *Nickolay* the court also discounted the failure of decedent to make a full disclosure of his property to the new wife before she signed the postnuptial agreement. The court stated: [11]

"She claims she did not know what her husband was worth—neither did she make inquiry."

So here, Mrs. Beat testified:

"I never asked him, and he never told me."

In *Oesau v. Estate of Oesau*,[12] the wife could neither read nor understand English. The attorney tried to explain the agreement as best as possible in her native tongue, but she did not understand completely. This agreement was upheld.

There is no affirmative evidence of any misrepresentation on Beat's part or of any coercion or duress exerted on Mrs. Beat in connection with the signing. The evidence shows acquiescence and consent on Mrs. Beat's part. Under the circumstances, Mrs. Beat cannot agree, then remain silent for three years, and now claim that she was defrauded.

In the final analysis, the trial court reasoned here that there was overreaching because Beat's release of rights in

---

[10] *Supra,* footnote 1.
[11] *Estate of Nickolay, supra,* 249 Wis. at page 574, footnote 1.
[12] *Supra,* footnote 4.

her estate amounted to nothing, as she could have effectively disposed of her property without his promise. Appellants contend that because the statute that was in effect on the date of the contract precluded the wife from disposing of the husband's curtesy right by will, Beat did release something of value. This section, however, became law after the contract on July 1, 1959,[13] and remained on the books for only two days before its effective date was postponed until July 1, 1961.[14] At the time of the signing of the agreement, a wife could dispose of land so as to bar curtesy rights.

However, the court's contention in regard to the curtesy statute was met in *Nickolay, supra,* when the court, in interpreting the pre-1947 statute, said:

"The contention that the husband released nothing by releasing any interest in her estate because he was not entitled to a curtesy right, as there were children by her former marriage, is not a sound argument because a curtesy right of the husband is under the absolute control of the legislature and changes in this law have been made in the past and can well be made in the future. It was at least a definite protection to the wife and her children in the event this law was changed. Any subsequent legislation could not impair the obligation of the contract by giving him a right to share in her estate. 137 A. L. R. p. 1099. Where both parties have property and the agreement provides that each shall retain the individual possession with all rights the same as if unmarried, that is sufficient." [15]

Even though Mrs. Beat did not contract to receive the $500 payment that was made to the widow in *Nickolay* and in *Bibelhausen,*[16] there was consideration flowing both ways so as to save the agreement as against a challenge for lack of or inadequate consideration. As in *Nickolay:*

---

[13] Ch. 705, Laws of 1957.

[14] Ch. 165, Laws of 1959.

[15] *Nickolay, supra,* 249 Wis. at page 574, 25 N. W. (2d) at page 453, footnote 1.

[16] *Supra,* footnote 4.

"Where both parties have property and the agreement provides that each shall retain the individual possession with all rights the same as if unmarried, that is sufficient." [17]

We are satisfied that the great weight and clear preponderance of the evidence does not show overreaching tantamount to fraud and that the agreement is not invalid.

Marriages like the present one are prompted more by a need for companionship than by love and affection. Both Mr. and Mrs. Beat had grown children and substantial property holdings. That he was willing to adequately provide for his new wife is evidenced by the trips they took, gifts, and the remodeling of the apartment. A father's desire to take care of his own children before providing for a new wife is not unhealthy. Especially is this true when the second marriage takes place after his fortune is amassed. Mrs. Beat was benefited in that she lived more comfortably after the marriage than she would have as a widow. She had ample time to read the agreement and make any objections known. In this case there is not sufficient evidence nor good reason to invalidate the agreement.

*Widow's Power to Elect Against Postnuptial Agreement.*

The trial court found that even if the agreement is valid, the widow may nonetheless elect to take her share under the law. Sec. 233.12, Stats., provides:

"233.12 WIDOW TO MAKE ELECTION. If any such jointure or pecuniary provision be made before marriage and without the assent of the intended wife, *or if it be made after marriage, she shall make her election after the death of her husband whether she will take such jointure or pecuniary provision or the share of his estate hereinafter provided.*" (Emphasis added.)

---

[17] *Nickolay, supra,* 249 Wis. at page 574, 25 N. W. (2d) at page 453, footnote 1.

Whether a widow may make an election under this statute turns in part upon whether a postnuptial agreement is a "jointure or pecuniary provision," and also on the effect of the enactment of sec. 6.015, Stats., in 1921, entitled "Women to have equal rights." [18]

Jointure is a historical animal, now extinct, whose vestiges clutter the statute book like bones in a museum to remind us of an age gone by. Under early English common law, most land was held under uses. A widow could not have dower in such lands because dower only applied to fee titles. A husband then transferred an interest in his land to himself and his intended in joint tenancy or "jointure" to protect the wife in case of his death. After the statute of uses, the wife could also have dower in such land. Ancestors to sec. 233.12, Stats., were adopted to prevent the double benefit inuring to her. Thus the wife had to choose between her jointure and her dower. Clearly a postnuptial agreement is not a jointure.

The "pecuniary provision" referred to in sec. 233.12, Stats., was to "be made for the benefit of an intended wife and in lieu of dower." [19] This was a twin to the jointure provision. A groom, because dower would not attach to uses, provided for his bride (often at the insistence of the bride's father and before marriage) in a way other than giving her an interest in his lands. After the statute of uses, the wife was

---

[18] "6.015 WOMEN TO HAVE EQUAL RIGHTS. (1) Women shall have the same rights and privileges under the law as men in the exercise of suffrage, freedom of contract, choice of residence for voting purposes, jury service, holding office, holding and conveying property, care and custody of children, and in all other respects. The various courts, executive and administrative officers shall construe the statutes where the masculine gender is used to include the feminine gender unless such construction will deny to females the special protection and privileges which they now enjoy for the general welfare. The courts, executive and administrative officers shall make all necessary rules and provisions to carry out the intent and purposes of this statute."

[19] Sec. 233.11, Stats.

prevented from having the pecuniary provision and dower by the election feature of the forerunner of sec. 233.12. Historically, a "pecuniary provision" would not seem to envision a postnuptial agreement. The pecuniary provision was given to the wife to safeguard her; she did nothing in return. A postnuptial agreement on the other hand is not designed for the wife's protection, but generally for the husband's. The wife must give a release in return.

Although from the standpoint of history, a postnuptial agreement would appear not to be a "pecuniary provision," this court has found, we think, erroneously, to the contrary.[20] Thus before *Estate of Nickolay*,[21] a postnuptial agreement was not an absolute bar to dower. *Nickolay*, however, without mentioning *Rowell*, *Wilber*, or sec. 233.12, Stats. (the election statute was not even mentioned in the *Nickolay* briefs) denied the right of election to a widow and upheld a postnuptial agreement. The validity of the agreement in *Nickolay* was based on sec. 6.015, which gave women the power to contract. Thus, the court stated (at p. 576):

"While the statute provides for a widow's right to dower in her husband's estate, sec. 233.01, Stats., likewise provision is made for a husband's curtesy right in the wife's estate, sec. 233.23. But this does not mean that the legislature may not authorize either party to contract relative to these rights. This is a question of policy for the legislature and the legislature has spoken. In *Wait v. Pierce* (1926), 191 Wis. 202, 210, 209 N. W. 475, 210 N. W. 822, it was said:

" 'It seems too clear for argument that sec. 6.015 further modified the rights of husband and wife as they existed at common law and that it was designed to place them on a basis of equality before the law not only in the particulars mentioned but "in all other respects." ' "

---

[20] *Rowell v. Barber* (1910), 142 Wis. 304, 125 N. W. 937; *Wilber v. Wilber, supra,* footnote 1.

[21] *Supra,* footnote 1.

"In *First Wisconsin Nat. Bank v. Jahn* (1922), 179 Wis. 117, 125, 190 N. W. 822, it was said, with reference to sec. 6.015, Stats., that—

" 'it means what it says, and that is that women shall be as free as men to make personal contracts.'

"This has been the law of this state for a number of years, and the legislature has not seen fit to change it."

The policy embraced by this section conflicts with sec. 233.12, Stats. : Women's right to freedom of contract versus protection afforded to her as a widow.[22]

The general circumstances and objective of a postnuptial agreement have been described :

"Generally, the typical situation in which a postnuptial contract is used involves parties who have previously been married; each has children by a former marriage; at the time of their marriage each possesses real and personal property not acquired or obtained from or through the other; and each party wants his or her property to pass to his or her heirs. In this situation, wherein both parties mutually agree to release their claims in the estate of the other, there seems to be no good reason why the postnuptial contract should not be sustained." [23]

Where a postnuptial agreement has been executed by the parties, which is free of fraud or overreaching by the husband as against his wife, a widow who enters into such a valid agreement should not be permitted to elect under sec. 233.12, Stats. It is inimical to give her the power to contract on the same par with men and then let her exercise her woman's prerogative of changing her mind, which men cannot do. Women fought long and hard to acquire their right to "freedom of contract" as incorporated in sec. 6.015. With

---

[22] See Mr. Justice Brown's dissent in *Fricke v. Fricke* (1950), 257 Wis. 124, 42 N. W. (2d) 500.

[23] Comment, 1960 Wisconsin Law Review, 91, 120.

this additional recognition they must expect to lose some of the special protections built into the law. In upholding the validity of this particular postnuptial agreement we are embracing a policy that favors marriage and works for its stability.

### The Widow's Allowance.

A further issue on this appeal concerns the order of January 24, 1964, which continued the widow's allowance of $300 a month, initially approved on September 28, 1962, for no longer than a year without a further order. No objection was made to the first order, but there was objection to the second.

The appeal on this issue stands or falls on the validity of the agreement and on the specific terms of that agreement. Appellants argue that when Mrs. Beat "waive[d] any and all of her dower and any other rights to any property, both real and personal" she was barred from taking an allowance under *Deller v. Deller*.[24] In that case the court ruled out an allowance where the widow, in an antenuptial agreement, had agreed to take $5,000 out of her spouse's estate for her sole use and benefit "in lieu of all right, title, and interest which she would have by law in the said estate"[25] and further agreed that she would not make any claim for any share in his "personal estate."

*Deller* is distinguishable. When Mrs. Beat gave a valid release of any claim to all property, personal as well as real, the release was only as to property "owned by Roy Beat at the time of their marriage." She did not release his "estate." A widow's allowance is an interest which by law a widow has in the estate of her husband but it is not a right to property, whether real or personal, owned by the spouse at the time of

[24] (1910), 141 Wis. 255, 124 N. W. 278.
[25] Id. at page 257, 124 N. W. at page 279.

marriage. Nothing in *Deller* or the agreement here requires that an allowance be denied to Mrs. Beat. We conclude that the trial court was correct in allowing the continuation of the widow's allowance to Mrs. Beat beyond the year concerning which there was no dispute.

*Further Proceedings.*

Mrs. Beat waived all rights to property "owned by Roy Beat at the time of their marriage." There is no mention of waiver as to any property which might be acquired thereafter. Appellants and respondent agree that if the agreement is valid and election not permitted, there must be a factual determination of what property was owned by Beat at the time of wedding. We agree.

*By the Court.*—Order continuing widow's allowance affirmed; judgment setting aside postnuptial agreement reversed, and cause remanded for proceedings not inconsistent with this opinion; costs on this appeal to appellants.