ESTATE OF KOEFFLER: KOEFFLER, Appellant, vs. KOEFFLER and another, Respondents.

*March 9—April 3, 1934.*

For the appellant there were briefs by *Poss, Toelle & Schuler,* attorneys, and *Benjamin Poss* and *H. W. Schuler* of counsel, all of Milwaukee, and oral argument by *Mr. Poss.*

For the respondents there was a brief by *Frank J. Lenicheck,* attorney for the executor, and *Bender, Trump, McIntyre & Freeman,* attorneys for Carl C. Koeffler, all of Milwaukee, and oral argument by *Walter H. Bender* and *Rodger M. Trump.*

NELSON, J. In order that the controverted questions may be understood, it is necessary that the material facts be stated fully.

Charles A. Koeffler, Jr., hereafter called the deceased, was born in 1856. He was graduated from the law school of the University of Wisconsin in 1880 and at once began to practice law in the city of Milwaukee. He practiced his profession until 1920, specializing in probate and real-estate law. His practice was extensive and he was recognized as a very

thorough and able lawyer. His reputation for honesty and integrity was very high. At the age of forty-two he married his first wife, who died in 1901. Carl A. Koeffler, a son and one of the respondents, was born in 1900. As time went by the deceased acquired large real-estate holdings and other investments. After 1920, when he retired from active practice, he devoted his time to the management of his properties and investments and to "Met-To-Wee," his country place, where he lived a simple, unostentatious life, finding joy and pleasure in raising chickens and live stock and in growing flowers, shrubs, and vegetables.

The petitioner was born in Ireland in 1886 and was therefore thirty years younger than the deceased. She came to the United States in 1909. Two of her sisters and three of her brothers had preceded her in coming to this country. She was well educated, having specialized in French, and studied music since childhood. In 1911, at the age of twenty-five, she entered the household of the deceased as a governess or tutor to Carl, who was then about eleven years of age. Her duties consisted of taking Carl to school, helping him with his lessons, reading to him, and playing with him. It was arranged that during her free time she might give private lessons in French. As time went on and Carl grew older her duties became less exacting. Commencing about 1916 and continuing down to the time of her marriage in 1923, she devoted a part of each school day to teaching French in Miss Treat's school and later on in the Lake school. Prior to 1921, when her mother died, she contributed to the latter's support. Up to the time of her marriage she had managed to save but little. When she first entered the household of the deceased her wages were $25 a month. In 1923, prior to her marriage, she was paid $75 a month by the deceased, and received for each month that she taught school the sum of $125. She had no particular knowledge of business affairs and had no business experience.

Met-To-Wee, hereinbefore mentioned, was, at the time of her marriage, the homestead of the deceased. It included about ten acres upon which the residence stood and other farm lands across the highway. The residence was old and the front part of it had formerly been a farm house. During the years that the petitioner resided there comparatively few improvements had been made to the house. The home, though comfortable, was not modern and its furnishings and equipment were comparatively simple and non-luxurious. Considerable evidence was adduced to show the simple, unostentatious standard of life lived at Met-To-Wee.

In 1922 the petitioner went to France to visit the grave of a deceased brother, who died while serving in the World War, and to further pursue her studies in French. Upon returning to Met-To-Wee it became known that she had met a young man in France whom she liked very much. The deceased learned of this attachment and became greatly depressed over the situation and apparently felt that life at Met-To-Wee would not be livable without her. He proposed that they intermarry but the petitioner did not readily yield to his entreaties. As a consequence the deceased became ill, remained in bed for a week, during which time he manifested real grief, and continually urged the petitioner to marry him. The petitioner finally yielded. The evidence relating to the engagement and to its terms and conditions is meager due to the fact that the petitioner was not permitted to relate the conversations had with the deceased. It does appear, however, that before the petitioner agreed to marry the deceased she told him that while she had affection for him she did not love him. On February 28, 1923, the petitioner and the deceased entered into an antenuptial agreement, the first paragraph of which is as follows:

"Witnesseth: That, whereas said parties have agreed to intermarry upon the understanding and condition, that an agreement should be entered into between them, prior to

their marriage, by which said Rose Loughran should agree and consent to accept and receive out of the estate of said Charles A. Koeffler, Jr., if she should survive him, a certain provision to be agreed upon by them before their marriage, as and for and in lieu of any and all her rights, title, interest, claims and demands of whatsoever kind, either of homestead, dower, inheritance, distribution or otherwise in his estate, or, in any property he might leave and should release, relinquish, waive and quitclaim any and all of her rights, title, interest, claims and demands in and to any part of his estate in consideration thereof; and whereas the parties have agreed on said provision so to be made for said Rose Loughran, she being in all respects fully and completely satisfied with the provisions so agreed upon by them to be made and hereinafter made for her and to be carried out for her use and benefit after the death of said Charles A. Koeffler, Jr., after her marriage to him."

The agreement provided in substance that the petitioner should be paid the sum of $25,000 in cash by his executors or administrator; that, pending the settlement of his estate, she should have an allowance of $2,500 per annum payable quarter-annually if practicable; that she should have an annuity of $2,500 per annum payable quarterly for her maintenance and support during her widowhood; that she should have, during the term of her widowhood, together with Carl, the right to use, occupy, and enjoy the home, free from expense either of taxes, insurance, up-keep, expenses for labor, wages, and the like, so long as she and Carl, or he and his family if he have any, shall jointly occupy said home; that during her widowhood she should have the right, together with Carl, to use, occupy, and enjoy the island and garage property at Eagle Springs Lake, located in Waukesha county, free from expense of taxes, etc.; that she should have for her sole and separate property all of the household goods, wares, furniture, and commodities, with but few exceptions, contained in the home or in the cottage at Eagle Springs

Lake, and also one of his automobiles to be selected by her at the time of his death; that she should be paid by his executors for each and every year that the parties lived together as husband and wife the further sum of $1,000 and a *pro rata* amount for part of any year; that she accepted the provisions made for her in lieu of all other rights and that she was in all respects satisfied with such provisions and released all her rights to his estate; that in order to fully insure to the petitioner the full and complete benefit and enjoyment of the provisions made for her and to avoid possible loss thereof, or part thereof, a trust should be created in her favor; that if for any reason she and Carl could not agree, or if it was not agreeable to them to enjoy, occupy, or use the home and the cottage at Eagle Springs Lake together, that Carl at his election should have the sole use and enjoyment thereof, in which event there should be added to the annuity of $2,500 the sum of $1,000 to defray the cost of her living elsewhere; that if the deceased should die testate, having made provision for her in lieu of the provisions made in the agreement, then the petitioner might, within one year after the filing of a petition for the probate of his will, elect to take under the agreement or under the will, but not under both.

The agreement was in duplicate and written in the longhand of the deceased. One of the duplicate copies was delivered to the petitioner a day or two before it was signed and executed. The contract was executed in duplicate in the presence of an attorney and another witness. The marriage did not take place until June 11, 1923, over three months after the contract was signed. Two of the petitioner's sisters resided in Milwaukee, of whom one was married and the other held a highly responsible business position.

It is undisputed that in 1923 the deceased was the owner of real-estate holdings fairly worth about $441,000 and per-

sonal property of the value of nearly $216,000. The real estate consisted of the Maryland Hotel,—a six-story downtown hotel having one hundred and eighteen rooms; the Fifth street property, located across the street from the Milwaukee Auditorium; a two-thirds interest in the West Water street property,—a four-story business block, located a block and a half north of the downtown retail district; an undivided one-half interest in the Marshall street property,—a three-story double residence; the Milwaukee street property; a small shop; the homestead, Met-To-Wee, hereinbefore described; the farm property located across the highway, and Wauchu-Set, the lake property. Before and at the time of signing the agreement the petitioner knew that the deceased owned all of the properties just mentioned and that he also had some mortgages, but she had no particular ideas as to the real values of such properties. On August 18, 1927, the deceased made a will, under the terms of which the petitioner would have been entitled to receive, if she had elected so to do, in lieu of the provisions of the antenuptial agreement, materially more than under the agreement. Thereafter, on May 29, 1929, the deceased executed a codicil to his will, wherein and whereby he revoked every provision made for the petitioner in his will and directed that she be limited to the provisions of the antenuptial agreement, which he made a part of the codicil by reference and by physical attachment.

The court found the facts substantially as stated and concluded that the codicil effectively revoked each and every provision theretofore made for the petitioner in the will; that the reference in the codicil to the antenuptial agreement did not constitute a provision for the petitioner within the meaning of sec. 233.13, Stats., and gave rise to no right on her part to make an election to take by law, and that the antenuptial agreement was in all respects legally binding, and

determined the rights of the petitioner to the estate. An order in accordance with its conclusions was entered.

We enter upon the discussion of the legal principles applicable to this controversy with the knowledge, revealed in numerous decisions found in the books, that antenuptial agreements are ordinarily entered into between persons who are of mature age, one or both of whom have children who are entitled to the bounty of their parents; that such agreements are seldom entered into by persons who are young and about to marry for the first time; that such contracts are obviously entered into for the purpose of effecting property settlements under which the prospective wife releases all claim to her prospective husband's estate in consideration of marriage and a share of his estate which is much less than she would receive under the law; and that such contracts tend to promote marriages between persons who are advanced in years.

It is the established law of this state that antenuptial agreements, in the absence of unfair characterizing circumstances, are regarded with favor rather than disfavor (*Oesau v. Estate of Oesau*, 157 Wis. 255, 147 N. W. 62); that there is nothing inherently suspicious or bad about such agreements (*Bibelhausen v. Bibelhausen*, 159 Wis. 365, 150 N. W. 516); that such contracts must be fairly and understandingly made (*Oesau v. Estate of Oesau, supra*), and must be free from fraud or imposition, and will not be approved where it appears that the future wife has been overreached or deceived or has been induced by false representations to make the contract (*Deller v. Deller*, 141 Wis. 255, 124 N. W. 278); that the burden is generally upon the one who seeks to impeach such a contract, to show its invalidity (*Oesau v. Estate of Oesau, supra*); that the fact that mutual promises of marriage precede the agreement as to property matters should not be given special significance and

does not constitute even a badge of fraud, much less a ground for declaring the contract void (*Bibelhausen v. Bibelhausen, supra*) ; that the circumstances characterizing the making of such contracts, where there is anything suggesting unfairness in the property provision, will be scrutinized with care (*Bibelhausen v. Bibelhausen, supra; Deller v. Deller, supra*) ; that an efficient presumption of fraud may arise where a prospective husband obtains from his intended wife a release of her marital rights to his property in consideration of marriage and a manifestly inadequate pecuniary provision in lieu thereof (*Bibelhausen v. Bibelhausen, supra*).

Applying the established law to the facts of this case, it is our opinion that the petitioner failed to impeach the antenuptial agreement herein. At the time she entered into the contract she was thirty-seven years of age—thirty years younger than the deceased. She had lived and worked in his home for about twelve years. She knew that for several years at least he had retired from the active practice of his profession and that he was maintaining a rather expensive establishment, even though modest for one of his wealth. She must have known that he was living on his income. She knew that he had extensive real-estate holdings among which were the Maryland Hotel and several other downtown properties. She knew that her earnings amounted to about $2,150 a year and that her savings up to that time were of little consequence. She knew all of these facts when she agreed to marry the deceased and when she entered into the antenuptial agreement. There is no evidence that any false representations regarding the properties of the deceased were made to her, nor is there any evidence that she was hurried into the making of the contract. She was given a copy of the contract a day or two before it was executed and clearly understood its provisions. After it was executed she had a duplicate copy of it in her possession for over three months before

entering into the marriage state. She therefore had ample opportunity to examine it and to have it examined and explained to her by others. This fact in itself strongly indicates that there was no disposition on the-part of the deceased to overreach her. *Oesau v. Estate of Oesau, supra.* The petitioner did not testify that had she known the true extent of her prospective husband's wealth at the time the contract was made she would not have entered into that agreement. The facts here are in strong contrast with those involved in such cases as *Denison v. Dawes,* 121 Me. 402, 117 Atl. 314, where the agreement was executed on the morning of the marriage; *Simpson v. Simpson's Executors,* 94 Ky. 586, 23 S. W. 361, where the agreement was executed in the evening and the prospective husband immediately insisted that the date of the wedding be advanced and the ceremony solemnized at 5 o'clock the next morning; *Tilton v. Tilton,* 130 Ky. 281, 113 S. W. 134, where the contract was signed in the hotel room just before the marriage; *In re Enyart's Estate,* 100 Neb. 337, 160 N. W. 120, where there was an interval of but one day between the time of executing the contract and the marriage; and *Taylor v. Taylor,* 144 Ill. 436, 33 N. E. 532, where there was an interval of only four days.

It is our opinion that the petitioner failed to make out a case unless it must be held that since the deceased was worth about $650,000, at the time the agreement was entered into, the pecuniary provision made for the petitioner was so manifestly inadequate as to give rise to an efficient presumption of fraud requiring the respondent and the estate to show that a full and fair disclosure of his real worth was made to her. The court below, in a very able decision in which due weight was given to all of the facts and the law applicable, held that, considering all of the circumstances, the pecuniary provision made for the petitioner could not be said to be

manifestly inadequate. With that conclusion we are in accord. The petitioner was thirty-seven years of age and had to work to support herself. At the time of her marriage she was earning not to exceed $2,150 a year. The deceased at that time was sixty-seven years of age and had a life expectancy of 10.54 years. By the terms of the agreement she was to become his wife and to be supported by him in a home and under a standard of living with which she was thoroughly familiar. At the time of his death she would receive $25,000 in cash and $1,000 for each year that she lived with him as his wife. She was to have all of the furniture and furnishings with but few exceptions, and one automobile to be selected by her from those belonging to him at the time of his death. In addition to those things she would receive, during her widowhood, the sum of $2,500 a year and have the use of the home and the cottage on the lake jointly with Carl so long as she and he could get along agreeably, with all taxes, repairs, up-keep, and servants' wages paid by the estate. In case she and Carl could not get along she was permitted to remove from the home and to live elsewhere, in which event she was to receive an additional $1,000 each year. The agreement provided that a trust would be set up to the end that the provisions made for her would be absolutely assured, no matter what might happen to the estate as a result of shrinkage or losses. It is our opinion that the provisions made for the petitioner may not be said to be so manifestly inadequate as to give rise to a presumption of fraud.

The petitioner earnestly contends that an agreement to marry gives rise to a confidential relationship which forbids the making of a valid antenuptial agreement between engaged persons unless the prospective husband shall fully and fairly disclose to his prospective wife the full extent and value of his properties. While there may be some authority tending to support that rule we cannot give it our approval. It is

far too broad. It does not harmonize with the established law of this state. Each case involving an antenuptial agreement differs from every other case and each case must be decided upon its own particular facts. The broad rule contended for might have application to a situation where the prospective wife was young and inexperienced, where the mutual promises to marry were clearly unconditional and not dependent upon the making of an antenuptial agreement, where the dominating motive was love, and where she entered into the antenuptial agreement with no knowledge as to the extent of her husband's property. In cases where a prospective wife is not in love with her prospective husband, or where the marriage is one of convenience or semiconvenience in which no sentiments of love play a part, there is little justification for asserting that the wife is not in a position to enter understandingly and advisedly into such a contract.

In the present case the petitioner specifically told the deceased that she did not love him although she had affection for him. While the marriage was probably not of that kind which may properly be called a marriage of convenience, it was not one dominated by love, at least so far as she was concerned. It was one apparently founded upon companionship.

While the court found that a complete binding agreement to marry existed before the formal antenuptial agreement was entered into, it is very doubtful that that conclusion is sustained by the evidence, if the court intended to hold that there was an unconditional agreement to marry wholly independent of an agreement as to the property. It appears pretty clearly that the agreement to marry took place in January, but just what was said to bring it about, or whether it was conditional or unconditional at the outset, does not at all appear. It would seem that if the engagement was unconditional she would hardly have entered into an agreement

a little over four weeks later in which it was deliberately declared as follows:

"Whereas said parties have agreed to intermarry upon the understanding and condition that an agreement should be entered into between them prior to their marriage," etc.

The only testimony tending to contradict the solemn declaration of the contract, subscribed by the parties, is that of Nan Loughran, a sister of the petitioner, who testified in substance that late in January, 1923, she had a conversation with the deceased in which he asked her if Rose (the petitioner) had told her the news and she said "yes" and that she then congratulated him; and the testimony of the petitioner that the deceased worked upon her pity to obtain her consent to marry him, that he was willing to marry her even though she did not love him, that he lay in bed for a week and cried and wore her down into marrying him, and that she told her sister and another friend of the engagement in the presence of Mr. Koeffler and he didn't deny it. It is our opinion that the announcements of the engagement, which were obviously very casual and occurred at a skating rink, were of no probative force to contradict the solemn declaration of the contract. However, it is unnecessary to overturn the finding of the trial court.

The petitioner also contends that since it appears that the antenuptial agreement was specifically mentioned in the codicil to the will, made a part thereof by reference and physically attached thereto, and since the codicil directed that the petitioner be limited to the provisions made for her in the antenuptial agreement, it should be held that the testator thereby made a testamentary provision for her within the meaning of the language "other provision be made for her in the will of her husband," found in sec. 233.13, Stats., and that she should be permitted to elect to take under the law. In our opinion this contention is so clearly without merit as to require no discussion.

*By the Court.*—Order affirmed.