Rose C. Petru, Appellant, v. Edmund J. Petru, Appellee.

Gen. No. 46,361.

First District, Second Division.
November 9, 1954.
Released for publication January 12, 1955.

Edward F. Zahour, and Richard M. Spencer, both of Chicago, for appellant.

David J. A. Hayes, of Chicago, for appellee; Albert E. Jenner, Jr., and Kenneth J. Burns, Jr., both of Chicago, of counsel.

MR. PRESIDING JUSTICE SCHWARTZ delivered the opinion of the court.

The plaintiff appeals from a decree dismissing a complaint which seeks to set aside an antenuptial agreement between herself and Miles Petru, her deceased husband. The complaint is verified by plaintiff and charges that Miles Petru fraudulently represented to her that all the personal property owned by him had a value of $50,000 and all his real estate had a value of $12,000; that she had full confidence in his expressed intention to treat her fairly and that she made no inquiry to ascertain the truth of his representation with respect to his wealth; that they were engaged to marry and, taking advantage of the confidential relationship thus established, he induced plaintiff to enter into the antenuptial agreement whereby she was to receive $50,000 and a residence worth $12,000; that it was not until after his death that she learned that the true value of his estate at the time of the agreement was $500,000, and not $62,000, as he had fraudulently represented to her.

Defendant, Edmund J. Petru, is the brother of Miles and the only person who stands to lose if plaintiff's position is sustained. In his answer he denied the averments of misrepresentation, fraud and concealment, denied that the parties were engaged at the time the antenuptial agreement was executed, and avers that plaintiff was fully informed of the character and value of Miles Petru's property. A very sharp issue of fact was thereby presented.

The cause was referred to a master, who found that the overwhelming weight of the evidence showed that there was no fraud, undue influence, or circumvention on the part of Miles Petru; that plaintiff entered into

3

the agreement of her own volition, with full knowledge of the fact that Miles Petru was worth more than a half million dollars; and that the provision made by Miles for plaintiff was not grossly disproportionate. He therefore recommended that the complaint be dismissed. The court after hearing the argument and the exceptions to the master's report, approved the report and entered a decree accordingly. It is from this decree that plaintiff appeals.

The antenuptial agreement is dated December 30, 1944. It recites that "the parties are not at present engaged to be married to one another but a marriage is contemplated between them, and Miles C. Petru has fully informed Rose C. Bartos of his financial situation, including the amount of his assets, liabilities and net income." It then provides that plaintiff, if she survives Miles Petru, should receive the money and real estate before referred to, in lieu of all rights which she might have had as a widow.

At the time of the events in question, Miles Petru was a childless widower, 47 years old. He and his brother Edmund operated a coffee and spice importing business which they inherited from their father, and which at the time of the marriage was substantial and prosperous. He is described by plaintiff and all the witnesses who knew him as honest, straightforward, unpretentious, truthful, sincere and reliable. Plaintiff was an industrious, hardworking, intelligent woman. She was the principal sustaining member of a household consisting of herself, her parents, and a crippled brother. She worked for a packing house, computing printing costs, labor operations time and amounts and kinds of paper and ink to be used in various jobs. She did extra work at times as a saleslady in a department store. Her maximum weekly earnings were $49 and her highest annual earnings in any year prior to her marriage never exceeded $3,000.

4

Although plaintiff and Miles Petru had been neighbors and friends in childhood, they had seen little of each other for years prior to the events in question. Miles' first wife died in November 1943. In December 1943, plaintiff met Miles at the wake for his mother. After that, they saw each other frequently. Plaintiff contends that a proposal of marriage soon followed, culminating in an engagement at Christmas time, 1944, when Miles gave her a ring. This, defendant vigorously denies. Miles, sometime prior to December 30, 1944, consulted his attorney, Leon Semarak, and after some discussion, directed him to prepare an antenuptial agreement, which Semarak did. It was typed by his secretary, Mildred Kratovil, who made an original and two copies. Semarak had advised Miles that if plaintiff acquiesced in the agreement, he would attend its execution and bring a witness with him. On December 30, 1944, at Miles' request, Semarak and his secretary went to Miles Petru's home, where they found him and plaintiff seated at a table, with the original and a copy of the agreement spread upon it. Plaintiff told Semarak that she had read and understood the agreement. He asked her whether she knew Miles was a very wealthy man, worth approximately $500,000. Plaintiff said that Miles had explained everything to her and that she understood it and was satisfied. Thereupon, in the presence of Semarak and Miss Kratovil, the parties signed the agreement. The attorney handed the original to Miles and the executed copy to plaintiff. All the substantial portions of Semarak's testimony above given were corroborated by Miss Kratovil. Following the execution of the agreement, the parties kept company for about nine months and were married September 15, 1945. They lived together until Miles' death in December 1949.

During the course of their marriage, Miles Petru made two wills. Both wills recited that he had entered into an antenuptial agreement with plaintiff prior to

5

his engagement and marriage. Both made provision for plaintiff in addition to the provisions made for her in the antenuptial agreement. In the last will, this additional provision consisted of a bequest of all household furnishings and other household articles and $50,000 in trust, payable to her during her lifetime at the rate of $250 per month, with the right to transmit the remainder by will as she desired. During their marriage, Miles also gave plaintiff moneys and securities which brought the total amount given her outright or set aside for her to $150,000. The will also bequeathed $50,000 to plaintiff and defendant as co-trustees, to be used for the construction of a dormitory, library or gymnasium at St. Procopius Orphanage, Lisle, Illinois.

Upon the trial of the case before the master, plaintiff completely abandoned the principal charge in her complaint, that Miles had falsely and fraudulently represented that all his personal estate consisted of $50,000 and all his real estate consisted of the residence in Cicero valued at $12,000. She testified that he never discussed his financial standing with her before marriage or during their marriage. "He never told me what he was worth and I never cared . . . He was a true gentleman . . . I don't think Miles would ever deceive anybody . . . I am sure he would not deceive somebody whom he loved . . . He was very sincere . . . He never falsely pretended to be something he was not." It is urged upon us by plaintiff's attorney that complaints are drafted by lawyers; that clients do not read them (although in her verification, plaintiff says she has read the complaint) and that plaintiff is not therefore bound by these averments. Under the Practice Act [Ill. Rev. Stats. 1953, ch. 110, § 159; Jones Ill. Stats. Ann. 104.035], a verified complaint calls for verification of the answer by defendant, and such verifications are no longer to be taken lightly, if they ever were. Originally, where a complaint was not verified,

it was recognized that a lawyer might state his understanding of the case as derived from information given him by his client, and courts did not give a complaint great weight as an impeaching document, particularly when plaintiff was illiterate or did not understand English. After many years of the new Practice Act, it must now be clear that it requires an honest statement of the case as understood at the time pleadings are drafted. The events in the instant case are simple and rest largely in the knowledge of plaintiff. It was her duty to state the facts as she knew them to her attorney and for him to write them down accordingly. We must assume that she did so and that she knew what she was doing when she swore to the truth of the averments. Her complete abandonment of the principal charge contained in the body of her complaint impairs confidence in her veracity.

Plaintiff bases her appeal on three principal grounds: (1) that she proved the engagement and, having thus established a fiduciary relationship, the burden is on defendant to show that Miles Petru made a full disclosure, which plaintiff argues he failed to do; (2) that no disclosure was made of Miles Petru's wealth; (3) that the amount of the settlement was disproportionate to Miles Petru's total wealth at the time the agreement was made and the amount plaintiff would have received if no antenuptial agreement had been made.

The master did not consider it necessary to pass on the issue of the engagement in view of his findings against plaintiff on the question of fraud and on her knowledge of Miles Petru's wealth. These findings having been approved by the court, the decree entered in conformity therewith must be sustained, unless it is against the manifest weight of the evidence. This principle has been stated repeatedly by the supreme and appellate courts of this State, most recently in Rizzo v. Rizzo, 3 Ill.2d 291 (1954). It should no longer

7

be necessary to labor the point. The issues of fact depend largely on the credence given plaintiff's testimony as against that of defendant's witnesses, particularly, the testimony of the attorney Semarak and his secretary, Mildred Kratovil. The contract itself recites that the parties were not then engaged, and that plaintiff was fully advised with respect to Miles Petru's wealth. The fact that the agreement provided $50,000 for plaintiff plus a house worth $12,000 was some notice to her that she was contemplating marriage with a man of means. In addition to the foregoing, there is much other evidence that should have put her on notice, such as the fact that Miles Petru's family always had a reputation in the neighborhood as people of means.

■ It is argued that the testimony of Semarak and his secretary is not worthy of belief because of some discrepancies. These discrepancies appear small alongside the glaring discrepancies and inconsistencies in plaintiff's testimony. In addition to her complete abandonment of her sworn charges that Miles Petru fraudulently misrepresented his wealth to her, she made numerous conflicting statements with respect to her reading and understanding of the antenuptial agreement, particularly that part of it which at the outset states explicitly that the parties were not engaged and that Miles Petru had made full disclosure of his wealth. She testified at different times that at the time of execution she had not read the agreement; that she had read it; that she read only the first page; and that she had merely glanced at it. The manifest weight of the evidence supports the findings of the master as approved by the chancellor.

An examination of cases in which antenuptial agreements have been upheld supports defendant's position that the provision for plaintiff in the instant case was fair and reasonable. Yarde v. Yarde, 187 Ill. 636 (1900); Megginson v. Megginson, 367 Ill. 168 (1937); Guhl v. Guhl, 376 Ill. 100 (1941); Geiger v. Merle, 360

Ill. 497 (1935); Brown v. Brown, 329 Ill. 198 (1928); In re Koeffler's Estate, 215 Wis. 115, 254 N. W. 363 (1934). In Yarde v. Yarde, supra, the husband had property worth approximately $30,000. He provided a home for the wife and an annual income of $200 for life. The court held that from a consideration of all the competent evidence, the contract was not unfair and that the wife had "knowledge of the character and extent of, substantially, all of Mr. Yarde's property, or, at all events, that the circumstances proved were such as to charge her with such knowledge." In Megginson v. Megginson, supra, the court held an antenuptial contract valid, although the husband had property worth $75,000 and the provision for the wife consisted of a $5,000 note, payable upon the husband's death. The court said that the record disclosed that plaintiff knew the husband owned two farms; that the plaintiff was a highly intelligent young woman and by the application of ordinary intelligence, could have verified any statements the husband made to her; and although admitting there were persons from whom she could have ascertained the value of the husband's land, the plaintiff stated that "she did not desire so to do." This is similar to the statement of plaintiff in the instant case, to-wit: that she did not know what property Miles Petru had and did not care. In the case of In re Koeffler's Estate, 215 Wis. 115, 254 N. W. 363 (1934), the court had before it an antenuptial agreement between a man of substantial means and a woman who had been his child's governess and lived in his home for many years. At the time of the agreement she was 37 years old and was earning not to exceed $2,150 a year. The husband was 67 years old. The wife was to receive $25,000 in cash and $1,000 for each year she lived with him as his wife, $2,500 yearly during widowhood, and provision for a home. At the time of the husband's death the estate amounted to $650,000. The court took a realistic view of the situation. It considered that

9

where an intended wife is not young and inexperienced and love is not the dominating motive for marriage, full disclosure of the extent and value of the prospective husband's property is not necessarily required to render valid an antenuptial agreement between engaged persons. It also considered that an engagement or the fact that mutual promises of marriage preceded the agreement as to property matters should not be given special significance and did not constitute "even a badge of fraud," much less a ground for declaring the contract void. The court said a presumption of fraud may arise where the agreement is based on a manifestly inadequate pecuniary provision; that while there is some authority tending to support the rule which forbids the making of a valid antenuptial agreement between engaged persons unless the prospective husband fully and fairly discloses to his intended wife the extent and value of his property, they considered that rule far too broad.

The Illinois cases in which antenuptial agreements were held invalid reveal certain general characteristics. In Hessick v. Hessick, 169 Ill. 486 (1897), the agreement recited that marriage was about to be solemnized and provided that each of the parties should after marriage hold and enjoy his own property as if the marriage had never been consummated. It gave the wife $300 in the event she survived her husband who was worth $35,000 or $40,000. The wife did not understand English and the agreement had to be read and interpreted to her in German. There was no evidence whatever that she knew the nature, character or value of her husband's property. In Warner v. Warner, 235 Ill. 448 (1908), the marriage was celebrated May 28, 1874 and the "antenuptial agreement" was dated May 29, 1874. The court found the agreement was actually executed on May 28. The provision made for the wife consisted of $500 per year to be paid to her quarterly

10

and $10,000 upon the death of her husband. They lived together for thirty years until the husband died in 1905. Two daughters were born to them. At the time of the execution of the agreement, the husband's wealth was estimated at $131,000, and at the time of his death his estate was worth approximately $2,000,000. He devised land worth approximately $50,000 to his wife. The court held that the provisions made for the wife by the contract were grossly disproportionate and that the provision in the contract for the payment of $500 a year to her for her personal use was not legally enforceable and therefore not to be considered. In Debolt v. Blackburn, 328 Ill. 420 (1928), the agreement was executed one day before the marriage and recited that the parties intended to enter into a marriage contract. The husband was worth approximately $83,000, and the wife had a farm worth about $15,000. The contract provided that neither of the parties should have any right or interest in the other's property. The court held that such a contract was valid if the intended wife had knowledge, or reasonably ought to have had knowledge, of the character and extent of the husband's property, but when the parties are engaged to be married, a confidential relation exists, and if the provision is disproportionate to the extent and value of the husband's estate, the burden is on those claiming validity to prove the intended wife had full knowledge. In that case the master found, and the court confirmed the master's finding, that no evidence had been introduced to show that the wife knew the nature, character or extent of her husband's property or that the same had been disclosed to her. In Taylor v. Taylor, 144 Ill. 436 (1893), the agreement recited that the parties were about to be married and that the husband would provide all the necessaries of life, etc., and that in the event of his death, the wife should receive $2,000 in full payment. The husband was worth $40,000. The

11

marriage was entered into four days after the date of the agreement. The court held that the provision was disproportionate.

These cases reveal that courts consider all the circumstances surrounding the marriage of the parties, their respective ages, abilities, experience and understanding, and the period of time which elapses between execution of the contract and the marriage. It has not been expressly stated, but obviously what courts have perceived in the case of antenuptial agreements made a day or two before marriage is the opportunity for undue pressure on the part of the husband. In the instant case, no such undue haste appears. The marriage did not take place for almost nine months after execution of the agreement. Our courts have made a distinction between contemplation of marriage and engagement. No confidential relationship is said to exist where the parties merely contemplate marriage, but does exist when they are actually engaged. It must be recognized that by current custom and convention, engagements to marry no longer carry the solemn public commitments which still exist in some societies. It appears to us that a more realistic approach would be to consider to what extent public or formal declaration of a betrothal was made and whether the prospective husband used it as a weapon with which to compel his fiancee to execute an antenuptial agreement on the eve of marriage or submit to the humiliation of breaking a formal, publicized engagement. The prospect of being left waiting at the church, if we accept the sad lament of the old ballad, can be a terrifying thought to a prospective bride. No such circumstances exist in the instant case.

Plaintiff in her testimony said she "did not care what was in the agreement," but was relying on the fairness of her husband. That reliance was by no means unjustified because in the end she had a total of approximately $150,000 either given to her by her

husband or set aside by him for her support and security. She extols the honesty and sincerity of her late husband. At the same time, she asks the court to hold him guilty of fraud and of taking advantage of a confidential relationship, attributing his alleged bad faith to unnamed third persons. The very nature of a confidential relationship is personal. If anyone obtained her confidence, it must have been Miles Petru. If anyone abused it, it must have been he, and yet she exonerates him. Equity has formulated the duties involved in a confidential relationship, and enforces them in order to prevent one who has acquired the confidence of another from abusing that confidence to his own advantage. It would be a perversion of this sound doctrine to hold that in spite of the good faith, sincerity and honesty which guided Miles Petru in his relationship with plaintiff, he was guilty of a breach of a confidential relationship.

 Plaintiff complains of the admission of certain evidence. It is common practice in this jurisdiction for masters in chancery to admit doubtful evidence subject to objection. This is upon the understanding that upon conclusion of the whole case, the master will on a a request for a ruling, make his decision, excluding consideration of such evidence as he holds immaterial. If no such ruling is made, it is presumed that only competent evidence was considered in arriving at his conclusions. Geiger v. Merle, 360 Ill. 497, 514 (1935); Brady v. Paine, 391 Ill. 596, 605–6 (1945). Such practice, judiciously employed, is proper and avoids the constant haggling over questions of evidence which frequently interrupts the course of a trial. It also avoids the necessity of granting a new trial in case evidence which should have been received is rejected. Judges should be able to determine and remove from their consideration improper evidence. In our consideration of the evidence to which objection was made, we resolved the doubt in favor of plaintiff. It still left

13

the overwhelming weight of the evidence in support of defendant's case.

Decree affirmed.

ROBSON and McCORMICK, JJ., concur.