ROCKER *v.* ROCKER, EXR.

[Cite as Rocker v. Rocker, Exr., 13 Ohio Misc. 199.]

(No. 707538—Decided December 22, 1967.)

Probate Court of Cuyahoga County.

*Messrs. Morley, Stickle, Keeley & Murphy,* for plaintiff, Paula B. Rocker.

*Messrs. Reddy, Gygli & Rocker,* for defendants, Manuel M. Rocker and Elmer Rocker.

*Messrs. Rippner, Schwartz, Carlin & Weis,* for defendants, Manuel M. Rocker, Elmer Rocker, Frances R. Arnstine, and Daniel E. Rocker, individually.

ANDREWS, Chief Referee. This case concerns the validity of an antenuptial agreement entered into on February 8, 1960, by the late Henry A. Rocker and his then intended wife, Pauline (or Paula) Newman Rosenblatt. They were married on February 13, 1960. It was the second marriage for each of them. Henry Rocker had been married to his first wife for over forty-six years. She died on June 4, 1954, at the age of sixty-six.

Paula's previous marriage to Isadore Rosenblatt terminated in divorce in 1949.

Henry A. Rocker died on December 29, 1966. He was survived by Paula and by the four children of his first marriage, three sons and a daughter. Paula had no children.

Henry Rocker's will was admitted to probate in this court on January 29, 1967, and on the same date two of his sons, Manuel M. Rocker and Elmer Rocker, were appointed coexecutors under his will.

On April 25, 1967, pursuant to the terms of the antenuptial agreement, Manuel M. Rocker tendered $10,000 to Paula Rocker, on condition that she elect to take under the will of Henry Rocker, which contained no provision for her. She refused the tender, and on June 14, 1967, elected to take against the will.

A few days previously, inasmuch as Paula Rocker had challenged the validity of the antenuptial agreement, Daniel E. Rocker, one of Henry Rocker's sons and a legatee under his will, had brought an action for a declaratory judgment, asking this court to determine the validity of the agreement.

On June 14, 1967, Paula Rocker filed an answer and cross-petition asking that the antenuptial agreement be de-

clared invalid and set aside, and that she be restored to her rights as surviving spouse of the decedent, Henry Rocker.

Subsequently, the plaintiff withdrew his petition, and, in effect, Paula Rocker, by reason of her cross-petition, is now the plaintiff; and the coexecutors of Henry Rocker's estate, plus his four children individually, are, in effect, the defendants. For simplicity, I will refer to the parties in that manner.

In substance the cross-petition alleges that before their marriage, the decedent, a practicing attorney for many years, in whom she reposed confidence and trust, persuaded and induced her to sign an agreement which provided that upon his prior death she was to receive $10,000, and no more, from his estate.

Plaintiff alleges, further, that the decedent concealed material facts from her with respect to the nature, extent, and value of his property and assets, in that he did not state the value of the stocks listed in the antenuptial agreement. She then alleges that in the appraisement approved by the Probate Court, the stocks were valued at $126,382.48, and that the appraisement shows less stock of the same kind than the amount listed in the schedule attached to the antenuptial agreement.

Plaintiff then alleges that the only other substantial asset of the estate consists of cash and bonds in the amount of $70,071.78, which, she says, is listed in the antenuptial agreement as approximately $30,000; and that the total assets of the estate, as appraised, amount to $196,659.36.

It is further alleged that plaintiff was ignorant "at said time" of the value of the stocks listed in the agreement, and relied upon the decedent to make full, fair, and truthful disclosure thereof, and had he done so, she would not have signed the agreement.

Finally, plaintiff states that the terms of the agreement are unjust and unfair to her, and that the provisions made for her are inadequate, disproportionate, and substantially less than she would receive under the statute of descent and distribution, which, she claims, would be $69,219.77.

Issue was joined upon all the major allegations.

As previously mentioned, the antenuptial agreement was entered into on February 8, 1960. Henry A. Rocker is designated as the "First Party," and Pauline Newman Rosenblatt (also known as Paula Blatt), is designated as the "Second Party."

The preamble of the agreement reads as follows:

"WHEREAS, both of the parties contemplate entering into a marriage relation with each other, and both are severally possessed of property in his and her own right, and it is desired by the parties that their marriage shall not in any way change their legal rights in the property of each of them from what they are before marriage; and

"WHEREAS, the said First Party has made full and complete disclosure of all his property, both real and personal, of every nature, kind and description;

"Now THEREFORE, it is agreed by and between the parties, as follows:"

By Item 1 of the agreement, Henry Rocker agrees that in case he survives Paula, "he will make no claim to any part of her estate as surviving husband."

By Item 2, in consideration of the marriage, he waives all right of dower to any real estate of which Paula may die seized, "and all right to her personal estate as surviving husband, heir at law, or otherwise."

Item 3 provides that if Paula survives Henry as his widow, she shall receive from his executors $5,000 if Henry dies within two years of the marriage, and $10,000 if he should die after two years of the marriage. As we know, he did not die until almost seven years after the marriage.

Item 4 reads as follows:

"It is understood and agreed that said First Party shall be entirely free in the management of his estate, and shall have the right to dispose of any part thereof without requiring the consent of the said Second Party."

Item 5 stipulates that the provisions made for Paula shall be free from inheritance, estate, and similar taxes, which shall be the obligation of Henry's estate.

The gist of Item 6 is that the provisions made for Paula shall be in full payment and discharge of all claims

she might have, as the widow or heir at law, to a distributive share of Henry's estate, and to all statutory rights she might have as his widow.

Consistently therewith, Paula agrees by Item 7 that in consideration of the marriage, if she survives Henry, she will make no claim to any part of his estate other than as provided in the agreement; and she expressly waives and relinquishes all claims of dower, homestead, year's allowance, or any other rights in his property to which she would be entitled by law.

Item 8 declares the following:

"It is mutually declared that it is their intention by virtue of said marriage, that neither one shall have or acquire any right, title or claim in and to the real and personal estate of the other, but that the estate of each shall descend to or vest in his or her heirs at law, legatees or devisees, as may be prescribed by his or her last will and testament, or by the laws of the state then in force, as though no marriage had ever taken place between them."

By Item 9 it is mutually agreed that if either of the parties desires "to mortgage or sell and convey his or her real or personal estate, each one will join in the deed of conveyance or mortgage, as may be necessary to make the same effectual."

Item 10 states:

"It is further agreed that this agreement is entered into by each party with full knowledge on the part of each as to the extent and probable value of the estate of the other, and it is their desire that their respective rights to each others (*sic.*) estate shall be determined and fixed by this agreement, which shall be binding upon their respective heirs and legal representatives."

The agreement was signed by the parties in duplicate in the presence of two witnesses, Ralph J. Simon and Manuel M. Rocker, who affixed their signatures thereto as witnesses. Mr. Simon was a deputy clerk and referee of this court at the time, and the signing took place at the court.

The signatures of Henry A. Rocker and Pauline Newman Rosenblatt (also known as Paula Blatt) were acknowl-

edged before Manuel M. Rocker, a notary public. In her acknowledgment, Pauline acknowledged "that she did execute the foregoing instrument, and that the same is her free act and deed."

Attached to, and as part of, the antenuptial agreement was a schedule of the assets of Henry A. Rocker as of February 1, 1960. The first division of the schedule was headed:

*"Stock in the following corporations:"*

and showed the following. (For the sake of simplicity, I will omit quotation marks.)

3560 shares—Lester Engineering Company (which it is my intention to distribute to my children during my lifetime).

27½ shares—Atlas Bolt & Screw Co.

91 shares (common), 29 shares (preferred)—Century Products, Inc.

101 shares Fulton Investment, Inc.

20 shares—Hoover Ball & Bearing Co.

American Standard Radiator Co.

14 1/6 shares—Falls Theatre Co.

116 2/3 shares—Cuyahoga Falls Amusement Co.

20 shares—White Sewing Machine Co.

10 shares—Vinrock, Inc.

The second division of the schedule listed the bonds and cash in banks, as follows:

Debentures in the face amount of $1,000—Lester Engineering Co.

Israeli Bonds—$1,000.

Ohio Loan & Discount Co.—bond $1,000.

U. S. savings bonds—approximate value—$5,000.

Cash in banks—fluctuating amounts—at present about $30,000.

The third and last division of the schedule related to Henry Rocker's life insurance in the aggregate face amount of $35,666. The companies were listed, and the cash surrender value as of February 1, 1960, was given as approximately $25,745. It was stated that the beneficiaries under the policies were Manuel M. Rocker, Frances Arnstine,

Elmer Rocker, and Daniel E. Rocker, in equal shares. As already mentioned, these are Henry Rocker's children by his first wife.

At the bottom of the schedule of assets are the initials "P. R.," which admittedly are the initials of Paula Rosenblatt, subsequently Paula Rocker, and were written there by her. Her assets were not set forth in the agreement or in a schedule.

It was stipulated that at the time of the signing Paula received "the original signed copy" of the agreement from Henry Rocker, and that plaintiff's Exhibit A is the original contract.

There was testimony that Henry Rocker dictated the contract and schedule to his secretary, who transcribed them.

From further stipulations we learn that on February 8, 1960, after the execution of the antenuptial agreement, Paula and Henry applied for a marriage license at the Probate Court of Cuyahoga County, Ohio; that on February 10, 1960, the Probate Court issued a marriage license to them; and, as already noted, that they were married on February 13, 1960.

It was also stipulated that at the time of the marriage Henry Rocker was seventy-seven years of age and Paula sixty-two. The wedding was in the rabbi's study. Henry's children were present, as was Mrs. Mabel Goldfarb, Paula's sister. After the ceremony, the bride and groom and Mrs. Goldfarb dined at the Arnstines.

It was stipulated that at the time of his marriage to Paula, Henry Rocker was self-employed as an attorney-at-law. He had practiced law for many years and enjoyed an excellent reputation.

Several knowledgeable witnesses testified to his honesty and integrity, using such terms as "a man of high probity," "a fellow of high moral principle," "the soul of honor," "a man of great integrity."

After the death of his first wife in 1954, and until the time of his marriage to Paula, Henry Rocker lived with his son-in-law and daughter, Mr. and Mrs. Harry W. Arnstine.

Although when he first came to live with them, his health was apparently good for a man of his age, it deteriorated during the six-year period, and he became less active and somewhat fearful of becoming ill, although he customarily went to his office when able. For that matter, he continued to go to his office during most of the years of his second marriage.

Mr. Arnstine testified that Mr. Rocker was ill a couple of times while living with the Arnstines; and Dr. Arthur A. Roth, a genito-urinary surgeon, testified that he performed medical services for Mr. Rocker beginning in 1954, and that on October 23, 1958, he operated on Mr. Rocker by removing the prostate gland. He saw Mr. Rocker intermittently after that until September 25, 1965. In 1959 Mr. Rocker had a urinary infection caused by a scar in the urethra, and Dr. Roth treated him for this periodically, both before and after the marriage to Paula.

There was also evidence that Henry Rocker had a fear of being left alone, and the Arnstines saw to it that he was never alone while he lived with them, as, indeed, did Paula and her sister after the marriage.

Declarations made by Henry Rocker to certain witnesses were admitted by me under an exception to the hearsay rule. They showed that Henry considered himself a burden on his daughter and son-in-law, and did not want to be a burden to any of his children. Thus, he was considering marriage. He said that he was old and didn't really feel that he should get married again, but, as a sort of convenience for himself, thought it would be better if he did. He discussed various prospects and thought it preferable to marry Paula rather than any of his women friends who had children. Paula had been a client of Henry Rocker's, and apparently he had known her for a considerable length of time and knew that she owned and operated a business. In discussing the possibility of marrying Paula, he declared that as an old man he wanted companionship and did not want to be alone.

There was a good deal of testimony indicating that in the years following the wedding, both Paula and her sister,

Mrs. Goldfarb, were attentive to Henry, did not leave him alone, and cared for him after he suffered a heart attack and when, in 1965, he had pneumonia. As a matter of fact, there was a stipulation that she was a good wife, accompanied by a contention that the matter was completely irrelevant to the issue of the validity of the antenuptial agreement. If the above evidence about Paula's attentiveness, and the stipulation, are relevant (and I admitted them), they are certainly not entitled to much weight on the issue.

It is interesting to note that on cross-examination Mrs. Goldfarb expressed the belief that because Paula was a good wife, she ought to get more money. Mrs. Goldfarb also testified to a declaration by Henry Rocker that he had four children and considered Paula as the fifth child.

Turning to Paula's career, it is stipulated that at the time of her marriage to Henry, she was the sole proprietor and manager of Nu Vogue Creations, a company engaged in the business of producing maternity garments; that the company had been in business for over eighteen years; that for business purposes, Paula B. Rocker was also known as Paula Blatt; and that she held over fifty patents in connection with her business.

There was testimony that in 1959 and 1960, Paula employed about eleven persons in the business. She designed the garments, saw that they were properly made, handled the advertising, and did a substantial part of the selling. One of her employees handled the bookkeeping and clerical work, and signed the checks. Paula evidently used the services of an accountant and a patent attorney.

On February 8, 1960, the company had an account with The National City Bank of Cleveland, which, on that date, amounted to something over $6,000.

Without objection an article from "Corset, Bra, and Lingerie Magazine" was admitted in evidence. The article congratulated Paula Blatt and her company on twenty-five years of success, and contained laudatory comments about her creativeness, determination, and sound judgment, and the company's growth. When asked on the witness stand whether the statements were "substantially true," Mrs.

Goldfarb replied: "Well, yes, to a certain extent, you know, naturally, it is built up a little."

There was testimony that in 1959, Nu Vogue Creations did a gross business of approximately $77,000, and in 1960, of about $62,000. There was no evidence about the profits of the company in those or any other years, but apparently Paula was self-supporting.

It is clear that at the time of her marriage to Henry Rocker and thereafter, Paula was the guiding spirit of Nu Vogue Creations, and enjoyed an excellent reputation, undoubtedly enhanced by her attendance at conventions of the American Medical Association, where her products were on display and came under the scrutiny of physicians. According to the article referred to above, the rapport between the manufacturer (Paula) and the doctors was a prime reason for the success of the line of goods.

Turning to the legal questions involved in this case, we start with the proposition that there is no public policy against antenuptial agreements as such; on the contrary, they are favored in the law. 28 Ohio Jurisprudence 2d, Husband and Wife, Section 72; 2 A. Lindey, Separation Agreements and Ante-Nuptial Contracts (Rev. Ed.) Section 90-30; Annotation, 27 A. L. R. 2d 883, at 885; *Stilley* v. *Folger* (1846), 14 Ohio 610, 649; *Osborn* v. *Osborn* (C. P. 1966), 10 Ohio Misc. 171.

"* * * However, in view of the confidential relationship generally subsisting between parties contemplating marriage, it is recognized that such an agreement must be fair, equitable, and reasonable in view of all the circumstances, entered into voluntarily and in good faith, and such contracts will be closely scrutinized by the courts to determine their justice and reasonableness." 27 A. L. R. 2d 883, 885.

See also, 2 A. Lindey, Separation Agreements and Ante-Nuptial Contracts (Rev. Ed.) Section 90-43; *Grogan* v. *Garrison* (1875), 27 Ohio St. 50; *Juhasz* v. *Juhasz* (1938), 134 Ohio St. 257.

The philosophy behind the confidential relationship doctrine is dramatically expressed in the opinion in *Stilley*

v. *Folger* (1846), 14 Ohio 610, 648, where the court imagines the following soliloquy by a chancellor:

" 'What person so exposed to imposition as a woman, contracting, personally, with her intended husband, just on the eve of marriage, at a time when all prudential considerations are likely to be merged in a confiding attachment or suppressed from an honorable instinct and sentiment of delicacy. * * * it would be a reproach to the law, if the very virtues and graces of woman were thus allowed to become the successful means of overreaching and defrauding them in bargains.' "

However, in the very next paragraph the court observes:

"It must, nevertheless, be admitted, that the conscience of the chancellor, though touched with sentiment so delicate, would hardly stand excused, should investigation cease, relief be decreed, and not even a glance cast nor a thought bestowed on the other side of this picture."

The court went on to uphold the antenuptial agreement.

In 1938, the Supreme Court of Ohio, in considering the requirements necessary to the validity of an antenuptial contract in which the prospective wife relinquishes her rights in her prospective husband's estate, had this to say:

"* * * The rule supported by the weight of authority may be stated thus: An engagement to marry creates a confidential relation between the contracting parties and an antenuptial contract entered into after the engagement and during its pendency must be attended by the utmost good faith; if the provision for the prospective wife is, in the light of surrounding circumstances, wholly disproportionate to the means of her future husband and to what she would receive under the law, the burden rests on those claiming the validity of the contract to show that there was a full disclosure of the nature, extent and value of the intended husband's property, or that she had full knowledge thereof without such disclosure, and that she, with this knowledge, voluntarily entered into the antenuptial agreement. * * *

"Under the rule, the contract is not invalidated mere-

ly because the portion fixed for the bride is small or disproportionate. After being fully informed and advised, the intended wife may be entirely satisfied with the provision made for her, and, if she then voluntarily enters into the contract, she is bound by its terms." *Juhasz* v. *Juhasz* (1938), 134 Ohio St. 257, 264.

See, accord, 2 A. Lindey, Separation Agreements and Ante-Nuptial Contracts (Rev. Ed.) Sections 90-36, 90-37, 90-43, 90-44; Annot., 27 A. L. R. 2d 883, 885.

Is the sum of $10,000, tax free, given to Paula Rocker by the terms of the antenuptial contract, "wholly disproportionate" to Henry Rocker's means and to what Paula would receive under the law "in the light of surrounding circumstances?" Bear in mind that, for the moment, we are assuming that the "confidential relationship" existed between the parties.

Looking solely to the "arithmetic" involved in the question of disproportion (other factors will be considered later), it is clear that the situation must be viewed as of the time the contract was made, rather than as of the time of Mr. Rocker's death, nearly seven years later. 2 A. Lindey, Separation Agreements and Ante-Nuptial Contracts (Rev. Ed.) Section 90-37; 28 Ohio Jurisprudence 2d, Husband and Wife, Section 74, page 197; *Grogan* v. *Garrison* (1875), 27 Ohio St. 50, 64; *Stotler* v. *Stotler* (Com. Pl. 1916), 19 Ohio N. P. (N. S.) 369, 27 Ohio Dec. 303; *In re Estate of Mosier* (Prob. Ct. 1954), 72 Ohio Law Abs. 268; *Hawkins* v. *Hawkins* (Prob. Ct. 1962), 89 Ohio Law Abs. 161; *Del Vecchio* v. *Del Vecchio* (Fla. 1962), 143 So. 2d 17; *Christians* v. *Christians* (1950), 241 Ia. 1017, 44 N. W. 2d 431; *Appeal of Smith* (1886), 115 Pa. 319, 324, 8 A. 582, 584 (where the court stated: "While her husband was a much richer man at the time of his death than when the contract was made, yet this fact does not enter into the question of its validity.") ; *In re Kaufmann's Estate* (1961), 404 Pa. 131, 171 A. 2d 48 (reasonableness of provision must be determined as of the date of agreement and "not by hindsight").

It follows that in determining the adequacy of the provision, we must consider what the wife would have received

had the husband's death followed immediately. *In re Estate of Mosier* (Prob. Ct. 1954), 72 Ohio Law Abs. 268.

The schedule of assets, attached to the contract, is dated February 1, 1960, a week prior to the execution of the contract. This is close enough in time for all practical purposes.

By stipulation, values as of February 1, 1960, were designated for certain of the assets, as follows:

| | |
|---|---|
| 3560 shares, Lester Engineering Co. | $32,930.00 |

(Inasmuch as Henry Rocker declared in the schedule that it was his intention to distribute this stock to his children, and this must have been known to Paula when she initialed the schedule, we need not include this stock in evaluating the reasonableness of the provision for Paula.)

| | |
|---|---|
| 20 shares, Hoover Ball & Bearing Co. | 495.00 |
| 70 shares, American Radiator & Standard Sanitary Co. | 1,010.62 |

(On the schedule the company name was inaccurately given, and the number of shares was omitted. This, of course, is irrelevant in so far as disproportion is concerned.)

| | |
|---|---|
| 20 shares, White Sewing Machine Co. | 235.00 |

All the above were designated as "listed securities," and their total value comes to $34,670.62.

The next item consists of bank accounts in the total amount of $39,038.41. This item is listed on the schedule as "fluctuating amounts—at present about $30,000."

The final category in the stipulations consists of bonds, as follows:

| | | |
|---|---|---|
| (a) | Lester Engineering Co. | $1,000.00 |
| (b) | Israeli Bonds | 1,000.00 |
| (c) | Ohio Loan & Discount Co. | 1,000.00 |
| (d) | U. S. Savings Bonds | 5,000.00 |
| | Total | $8,000.00 |

As may be recalled, the schedule included life insurance in the face amount of $35,666, but Mr. Rocker's children

were the beneficiaries; consequently, this item cannot be considered in our computation.

With reference to corporate stock, the stipulations omitted the following holdings, which were in the schedule:

27½ shares, Atlas Bolt & Screw Co.

91 shares common and 29 shares preferred, Century Products, Inc.

101 shares, Fulton Investment, Inc.

14 1/6 shares, Falls Theatre Co.

116 2/3 shares, Cuyahoga Falls Amusement Co.

10 shares, Vinrock, Inc.

The testimony showed that all these were closely held corporations. Their stock was not listed on any exchange; there was no public market for the shares; and there were apparently no sales of shares during 1959, 1960, or 1961. Some of the companies made a profit during those years; one lost money. There was no other evidence about the value of these stocks at or about the time the antenuptial agreement was signed. Clearly, there was not sufficient evidence before me on which I could base a finding of the value of these shares at the time in question. See *In re Estate of Jones*, 23 Ohio App. 74, 5 Ohio Law Abs. 329; motion to certify overruled, 23 Ohio Law Rep. 623 (1925); *Tax Commission* v. *Clark* (1926), 20 Ohio App. 166, 4 Ohio Law Abs. 325; Eisele, Valuation of Closely Held Stocks, 5 Western Reserve Law Review 37 (1953-54).

As already noted, counsel for Mrs. Paula Rocker introduced the inventory and appraisement of Henry Rocker's property at the time of his death, and I admitted this tentatively on the theory that it might be helpful in evaluating the unlisted stock.

Counsel for Mrs. Rocker attempts to use the inventory and appraisement, including the total gross amount of the property, as a base on which to predicate the alleged inadequacy of the contractual provision for Mrs. Rocker. Under the rule previously stated that the valuation at the time the agreement is executed is what counts, it would be completely illogical and inequitable to substitute the values on the date of Mr. Rocker's death (nearly seven years lat-

er) for the values stipulated as of February 1, 1960. And it would be equally inequitable to include, in determining the issue of inadequacy, items appearing on the inventory and appraisement which were not even owned by Henry Rocker at the time the agreement was executed.

Similarly, we have no right to substitute the total bank account figure on the inventory and appraisement, *i. e.*, $70,071.78, for the February 1, 1960, stipulated amount of $39,038.41.

Omitting the Lester Engineering Company stock for reasons already explained, Henry Rocker's assets as of February 1, 1960, totalled $48,779.03, plus the unlisted stocks. One of these, namely, Vinrock Inc., was not included on the inventory and appraisement, so evidently was disposed of before Mr. Rocker's death.

Despite some slight discrepancies in company names, it appears that at his death, Henry Rocker still owned his stock in the other five closely held corporations. The inventory and appraisement shows a total value for these holdings of $107,671.12.

Should I take this into consideration on the issue of disproportion? Am I to assume that on February 1, 1960, nearly seven years earlier, the stocks had these values? In a converse situation, it was held that the appraised value of corporate stock on August 6, 1932, cannot be presumed to be the same on July 30, 1934. *City of New Philadelphia* v. *Hurst* (1937), 57 Ohio App. 479. By like reasoning we cannot assume that the value of certain stock on February 1, 1960, was the same as its appraised value on December 29, 1966.

Plaintiff alleges that the provision for her in the antenuptial agreement is disproportionate. As a means for computing the disproportion, she uses the value of the gross estate on the inventory and appraisement. This is erroneous. On the only evidence before us, Henry Rocker's assets on February 1, 1960, amounted to $48,779.03. If we use this gross figure, without even considering any deductions for debts, costs of administration, and taxes, Paula Rocker's one-third share of the estate would be approxi-

mately $16,260.00. On the figures alone, the $10,000, free from taxes, is not so grossly disproportionate as to shock the conscience of the chancellor.

Having alleged that the provisions made for her in the agreement are inadequate and disproportionate, Paula had the burden of proof on this issue. *Stilley* v. *Folger* (1846), 14 Ohio 610, 650 (cannot conclude disproportion where no satisfactory evidence of value of husband's property); *Christians* v. *Christians* (1950), 241 Ia. 1017, 44 N. W. 2d 431; *In re Thorman's Estate* (1913), 162 Ia. 316, 144 N. W. 5 (court cannot say provision disproportionate, as no showing of amount of property); *Matter of Phillips* (1944), 293 N. Y. 483, 58 N. E. 2d 504 (no evidence about amount of husband's assets); *Juhasz* v. *Juhasz* (1938), 134 Ohio St. 257 at 264. See, also, 2 A. Lindey, Separation Agreements and Antenuptial Contracts (Rev. Ed.) Section 90-84, and cases cited.

No satisfactory evidence having been produced regarding the value of the unlisted shares on February 1, 1960, or thereabouts, except that they had no market value, they cannot be considered on the issue of disproportion.

Fortunately, however, it is not necessary for me to rest the decision in this case solely on the point that the competent evidence of values fails to disclose gross disproportion, for even where the proof shows a great disparity in the figures, gross disproportion is not necessarily the result. Other factors and the surrounding circumstances must be taken into account. 2 A. Lindey, Separation Agreements and Ante-Nuptial Contracts (Rev. Ed.) Section 90-37; Annot., 27 A. L. R. 2d 883, 890, note 18; *Juhasz* v. *Juhasz, supra.* Similarly, the duty to disclose, which arises from gross disproportion, is subject to the particular circumstances. Annot., 27 A. L. R. 2d 883, 885, note 2. In the last analysis, each case in this field of the law must be decided on its own particular facts, and not solely by rote. See, for example, *In re Koeffler's Estate* (1934), 215 Wis. 115, 254 N. W. 363.

In the present case, regardless of disproportion, disclosure, or anything else, it seems obvious that Paula, a bright and experienced woman despite her professed lack

of knowledge of corporate shares and their values, was well aware of Henry Rocker's desire that their marriage should interfere as little as possible with the inheritance which Mr. Rocker's children would normally receive upon the death of their father. Whether or not she understood all the ramifications of the contract, she must have realized that in order to fulfill Mr. Rocker's desire, she was to receive $10,000.00 and no more from his estate. She signed the contract and acknowledged that it was "her free act and deed."

There is no evidence of fraud on the part of Mr. Rocker, and there is no reason to believe that a man of his undoubted integrity would try to cheat his intended wife. Moreover, he agreed to relinquish his interest in her estate in case of her prior death.

There are many cases in which antenuptial contracts have been upheld under similar circumstances. In some the term "marriage of convenience" has been used. See Annotation, 27 A. L. R. 2d 883, 885, 889, 890; 2 A. Lindey, Separation Agreements and Ante-Nuptial Contracts (Rev. Ed.), Section 90-42; *Stilley* v. *Folger* (1846), 14 Ohio 610 (in which, however, unlike the present case, the woman was a schemer); *Pniewski* v. *Przybysz* (App. 1962), 89 Ohio Law Abs. 385 (in which there were other decisive factors).

But it is not necessary to pin a label onto such a contract. The main reason for upholding it is that, essentially, the woman knows perfectly well what she is doing and does it voluntarily. See Neely's Appeal, 124 Pa. 406, 426, 16 Atl. 883, 885 (1889) (not precisely the same on its facts, but expressing the idea); *In re Koeffler's Estate* (1934), 215 Wis. 115, 254 N. W. 363.

As stated in Annotation, 27 A. L. R. 2d 883, 889-890:

"Where it appears from the surrounding circumstances that the marriage contemplated by parties entering into an antenuptial property settlement is primarily one of convenience, so that the business judgment of the parties is unlikely to be clouded by the prehymeneal ardor and tenderness ordinarily assumed by the courts to be characteristic of those about to embark upon the matrimonial

seas, the confidential relationship ordinarily found to exist may be found wanting and the courts may refuse to recognize any duty to disclose the nature and extent of the parties' property interests.''

It is my belief that Paula Rocker entered into the contract understandingly and advisedly in so far as the essential terms of the contract are concerned, and that she should not now be permitted to disavow it even though, upon reflection, she thinks she should have received more.

Because this opinion is already too long, I will omit a discussion of other points raised by counsel.

CONCLUSION OF LAW

The antenuptial agreement is valid and should not be set aside or canceled.