PER CURIAM.
The appellant-executor seeks review and reversal of an adverse final decree which nullified an ante-nuptial agreement.
The agreement was executed in 1946, a few days prior to the marriage of the ap-pellee and appellant’s decedent. The appel-lee was 35 years of age and the deceased was 68. The appellant is the son and only child of the decedent. The deceased, a widower at the time of the marriage, owned an interest with his son in a chain of hardware stores as well as several valuable pieces of real property in the District of Columbia.
The appellee met the deceased in 1939 when she, her mother and her two children rented a house from him. She had lived in Washington, D. C., since she was four years old and at the time the parties met, she had been working as a restaurant waitress and cashier. At the time of the marriage, the appellee had approximately $8,-000 which she had derived from the sale of a home in Washington, D. C. The appellee testified that prior to their marriage, she and the deceased had been going together and on two occasions, the first in 1941 and the second in 1945, had stayed together away from Washington, D. C.
By the terms of the ante-nuptial agreement, appellee released her dower and other interests in all real and personal property located in Washington, D. C., of which the deceased was seized or possessed at the time of their marriage. By specific provision, the foregoing release did not apply to property outside of the District of Columbia or that might be acquired after marriage. It was further agreed that the deceased was to convey a home which he had in Washington, D. C., to the appellee as a tenancy in the entireties. After execution of the agreement, the parties, by mutual' consent, substituted other real property in the District of Columbia for the property described in the agreement.
The complaint charged that the agreement was without consideration, inequitable and unfair, procured by overreaching and undue influence, that there had been a failure to disclose to the appel-lee the nature, extent and value of the de *773 ceased’s property, and further, that the agreement disclosed such a disproportion between the amount that the appellee was to receive and the value of the deceased’s estate that it amounted to designed concealment on the part of the deceased in derogation of the appellee’s rights.
The chancellor in the decree made certain findings as follows:
“The plaintiff, Josephine Del Vec-chio, then Josephine Gleason, entered into an agreement to marry, one, Domenico Del Vecchio. They had been going together for some time when Domenico was a married man but his wife died and later a prenuptial agreement to marry was entered into on April 10, 1946.
“The son of Domenico Del Vecchio, Sam Del Vecchio, was the moving party in causing the pre-nuptial agreement to be signed by Domenico and Josephine Gleason. The reason being that he had put in considerable time, effort and brains into a chain of hardware stores, which the father had started, and the son had built up into a large and prosperous business and he, the son, wanted protection in this business, in which he owned fifty one percent of the stock and Domenico owned forty eight percent of the stock, the other share being held by another party.
“It is the finding of the court that a full and fair disclosure was not made to Josephine Gleason on or before April 10, 1946, when the pre-nuptial agreement was signed, of Domenico Del Vecchio’s holdings and wealth to such an extent that she could intelligently compute what she stood to lose or gain by signing the contract. See Comments and Summary in 27 A.L.R. (2d) at page 884, and later pages.
“Domenico Del Vecchio, according to the testimony, was worth about one half million dollars at or about April 10, 1946, and the terms of the prenuptial agreement would indicate that the provision made for Josephine Del Vecchio in the agreement was disproportionate to the means of Domenico Del Vecchio. See Weeks v. Weeks 1143 Fla. 686), 197 So. 393.
“Josephine and Domenico were married on April 15, 1946, and lived together apparently happy and contented until May 22, 1958, when Domenico died.
“Domenico and Josephine acquired property during the marriage, it being held by the estate in the entireties, so that she received property of considerable value upon the death of Dome-nico.” [Italics in original decree.]
The ante-nuptial agreement, inter alia, provided :
“It is further agreed that this agreement is entered into by each party with full knowledge on the part of each as to the extent and probable value of the estate of the other by virtue of said proposed marriage * *
The chancellor’s decree appears to be based upon two principles: (1) that there had been a failure to make a full and fair disclosure at the time the agreement was signed; and (2) that the terms of the agreement were such that provisions made for the appellee were disproportionate to the means of the deceased.
Normally the question of whether full and fair disclosure was made constitutes a question of fact, but the establishment of the mere failure to disclose, where the facts and circumstances indicate that the individual knew or should have known of the other’s financial status, would not, in the absence of other factors, render an ante-nuptial agreement void. The establishment of failure to disclose would not, per se, render an otherwise valid agreement invalid, particularly where such failure was not shown, nor does it appear, to have op *774 erated to the wife’s detriment or rendered the agreement as to her inequitable.
The primary purpose of these agreements is to restrict and circumscribe the right of one to participate in the estate of another. In this instance, the agreement recited that the contracting parties had full knowledge of the extent and probable value of each other’s estates. The deceased was a man 68 years of age who became a widower by the death of his wife approximately four months prior to his marriage to the appellee. The appellee had known the deceased for some seven years, had rented a house from him for nearly five years, and although not conversant with his actual net worth, knew or should have known that he was a man of considerable material substance. She knew he was the owner or part owner of a chain of hardware stores in the District of Columbia and that he was the owner of at least two parcels of real property in the District of Columbia. The purpose of the agreement, as represented to her, was so that she could not interfere in the hardware business, then being conducted by the appellant. All of these factors, when considered in the light of what the appellee actually gained as a result of her marriage to the deceased, fail to establish that the alleged failure of the deceased to disclose his exact wealth resulted in any overreaching or imposition upon the appel-lee in the execution of this agreement. There is no proof here that the deceased misrepresented his true worth, unless his silence can be so construed; that he obtained her signature by duress, fraud or undue influence; or otherwise committed any act constituted to deceive the appellee. On the contrary, she charges the appellant as the moving party in the preparation and execution of the agreement with the deceased as no more than a passive participant. Even after the marriage, according to the appellee, the deceased refused to discuss the agreement with her.
The chancellor’s decree appears also to be based upon the fact that the terms of the ante-nuptial agreement were such that the provisions made for the appellee were disproportionate to the means of the deceased. By this adjudication, we assume that the chancellor indulged the presumption of designed concealment by reason of the establishment of the fact of disproportionate provision.
To conclude that the provisions in an ante-nuptial agreement are disproportionate because the wife gets less than what she would have gained as a widow without the agreement would result in invalidating and rendering unenforceable all such ante-nuptial agreements. As we understand the rule, it applies only when the disproportionate provisions appear to be so small or unreasonable as to render them inequitable to the wife. Such does not appear to be the case here.
The appellee testified that she was unversed in the law, had advanced no further than the eighth grade in school and was totally unfamiliar with the terms of the agreement. At the time the suit was instituted, the appellee, as a result of her joint ownership as a tenant by the entireties with the deceased, became the absolute owner of real property with a net value in excess of $77,000. The evidence admitted at final hearing indicates that the deceased’s estate was valued at $114,000, although it appears from documents included in the record but not admitted into evidence at the trial, that efforts were being made to establish that the estate is of a greater value. The evidence shows that after the agreement was executed the deceased, with the consent of the appellee, sold the property described in the agreement and substituted another valuable piece of improved real property in the District of Columbia which he had placed in their joint names. Later, in addition, he purchased valuable real properties in Dade County, placing these in their joint names, all of the properties having a total cost of approximately $130,000. The appellant testified that the deceased was worth approxi *775 mately one-half million dollars at the time of the execution of the agreement.
There is a lack of uniformity among the authorities in the application of the doctrine of designed concealment based on a showing of disproportionate provision for the wife. The application of the rule appears to be governed by the circumstances and facts of the particular case. One case in particular which we feel is closely analogous to the facts in the instant case is In re Emery’s Estate, 362 Pa. 142, 66 A.2d 262. See also Petru v. Petru, 4 Ill.App.2d 1, 123 N.E.2d 352. In the Emery case, the decedent made a property settlement with his intended wife before their marriage. He was 70 years of age and she was a widow of 39 who had been a beauty shop operator and waitress with average yearly earnings of $1,500. By the terms of the property settlement agreement, the intended wife agreed to accept the sum of $50,000 in bonds and securities. The husband deposited the securities with his attorney under instructions to transfer them to the intended wife’s name in accordance with the agreement. Shortly thereafter, the husband died leaving an estate in excess of one million dollars. A preamble to the property settlement agreement recited:
“The first party [decedent] has fully informed the second party [appellant] of his financial situation and worth.”
The agreement contained other provisions indicating that the parties had carefully read the agreement, discussed its legal effect and had made full disclosure to each other. In commenting on the recitals as well as the provisions made for the intended wife, the Supreme Court of Pennsylvania said [362 Pa. 142, 66 A.2d 265]:
“These solemn admissions of appellant, appearing in the agreement, are affirmative proof that she was not deceived * * *.
“Since the very purpose of ante-nuptial contracts is to change the provision the law makes for the intended wife * * * percentages are of little value in determining the adequacy of the consideration in cases of this character. The test of the reasonableness of the provision for the wife is not whether she would receive as much as she would be legally entitled to receive in the absence of the antenuptial agreement but whether the provision for her is sufficient to enable her to live comfortably after the husband’s death, in substantially the same way as she lived prior to the marriage, considering all the circumstances.”
Our research discloses that the Supreme Court of Florida has discussed the disproportionate provision rule in only one case-Weeks v. Weeks, 143 Fla. 686, 197 So. 393. In that case, the court held that reconciliation of husband and wife and resumption of marital relations rendered void a previous separation contract, settling property rights. The disproportionate provision rule, as it appeared in the Illinois case of Murdock v. Murdock, 219 Ill. 123, 76 N.E. 57, was quoted with approval. A comprehensive annotation of the rule as it applies to antenuptial contracts appears in 27 A.L.R.2d 883. We conclude that the rule as stated is not applicable to the facts of this case..
One other point which we feel deserves consideration in this case is the fact that the appellee, in attempting to invalidate and rescind the agreement, has nowhere offered to return any of the properties of which she is now the fee simple owner. See Horney v. Rhea, 152 Fla. 817, 12 So.2d 302. These properties were purchased by the deceased and placed in their joint names pursuant to the terms of the ante-nuptial agreement as well as an alleged oral promise made by the deceased at the time of the execution of the agreement. If the appellee were to succeed in nullifying and rescinding this agreement, she would in effect benefit by her own inequitable conduct. This would be true because on one hand she contends that the agreement is *776 invalid and that she should be restored to her rights as widow in the estate of the deceased, while on the other, she urges (impliedly by her conduct) the validity of the agreement insofar as it was performed by the deceased during his lifetime.
Concluding as we have that the agreement was fair and equitable to the appellee and no evidence of fraud, duress, overreaching or lack of consideration having been shown, it follows that the decree appealed should be and is hereby reversed with directions to dismiss the complaint.
Reversed and remanded with directions.